**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
**JANE DOE,**

<b>Plaintiff,</b>

Civil Action No:

    1:19-CV-284 [GLS/CFH]

<u>**COMPLAINT**</u>

-against-

**UNION COLLEGE, THE BOARD OF TRUSTEES**
**OF UNION COLLEGE, MELISSA A. KELLEY,**
**individually and as an agent for Union College, TRISH**
**WILLIAMS, individually and as an agent for Union**
**College; DARCY A. CZAJKA, individually and as**
**an agent for Union College,**

<b>Defendants.</b>
-----------------------------------------------------------------------X

    **PLAINTIFF JANE DOE**[1] (hereinafter referred to as "Plaintiff"), by her attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

<u>**THE PARTIES**</u>

    1.    At all times relevant to this Complaint, Plaintiff was and is a female citizen of the United States who resides in the State of New York.

    2.    At all times relevant to this Complaint, Defendant Union College (hereinafter "Defendant Union" or the "College") was and is a private institution of higher education with its campus located at 807 Union Street, Schenectady, New York 12308.

---

[1] Plaintiff files herewith a motion for leave to file under a pseudonym.

3.      Defendant Union, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX").

4.      According to published Union College Financial Statements for the fiscal year ended June 30, 2018, Defendant Union received $2,550,466 in government grants, in addition to the federal student loan money it received.  Defendant Union also reported allocations for sponsored activities which included "various research and instructional programs funded by external parties including the federal government, state governments, and private foundations." *See* Union College Financial Statement, June 30, 2018, available at https://www.union.edu/files/finance/201811/fs-18.pdf.

5.      At all times relevant to this Complaint, the Defendant Board of Trustees of Union College was and is comprised of thirty-five (35) members, including the president of the college, and as "a corporate body, has owned the College and been the College's designated legal representative throughout its history." *See* https://www.union.edu/about/leadership/trustees.

6.      Defendant Melissa A. Kelley ("Defendant Kelley") is a natural person and, at all times relevant to this Complaint, was the Title IX Coordinator for the College and served as the coordinator for Plaintiff's Title IX complaint.

7.      Upon information and belief, Defendant Kelley is a resident of the state of New York whose last known business address was 807 Union Street, Schenectady, New York 12308.

8.      Defendant Trish Williams ("Defendant Williams") is a natural person and, at all times relevant to this Complaint, was the Senior Associate Dean of Students and Director of Student Conduct for the College, and was responsible for coordinating the disciplinary process during Plaintiff's Title IX complaint.

9.     Upon information and belief, Defendant Williams is a resident of the state of New York whose last known business address was 807 Union Street, Schenectady, New York 12308.

10.     Defendant Darcy A. Czajka ("Defendant Czajka") is a natural person and, at all times relevant to this Complaint, was the Chief of Staff for the College.  Defendant Czajka served as the Chair of the Appeals Panel for Plaintiff's Title IX complaint.

11.     Upon information and belief, Defendant Czajka is a resident of the state of New York whose last known business address was 807 Union Street, Schenectady, New York 12308.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over Plaintiff's claim(s) based on 28 U.S.C. §§ 1331 and 1332.

13.      Venue is proper in this case pursuant to 28 U.S.C § 1391(b)(2) because the events or omissions which give rise to Plaintiff's claims took place in Schenectady County, New York which is located in the Northern District of New York.

## FACTUAL ALLEGATIONS

**Plaintiff Arrives as a First Year Student at Union College**

14.     Plaintiff was a high achieving student at a private New York City high school who was offered admission to Defendant Union based upon her strong academic and leadership background.

15.     After accepting the College's offer for admission, Plaintiff submitted an application to participate in a Leadership Pre-Orientation program held at Defendant Union just prior to the start of First Year student orientation.

16.     Plaintiff arrived on Defendant Union's campus on August 31, 2017, to move into her dormitory room as a freshman student.

17.     On September 3, 2017, her third day on the College's campus, Plaintiff returned in the afternoon from her leadership program to her dorm room.

18.     At such time, one of the other First Year students in Plaintiff's dorm ("Student A") had an older sister who also attended Defendant Union. Student A's sister invited Student A and Plaintiff to attend a fraternity party hosted by the fraternity Theta Delta Chi ("TD Chi") that same evening.

19.     Upon information and belief, TD Chi was founded at the College in the 1800s and is considered to be a favored fraternity.

20.     Plaintiff and Student A agreed to attend the TD Chi party.

**TD Chi's Documented History of Disorderly and**
**<u>Dangerous Conduct Towards Fellow Union Students</u>**

21.     Upon information and belief, the College has permitted and condoned its all-male fraternities, including and especially TD Chi, to foster a social environment rampant with sexual violence and harassment towards women.

22.     Upon information and belief, TD Chi is well-known for hosting large parties on and off campus which dominate the social scene for students at the College and which pose a significant risk to female students of sexual assault, harassment, and sexual violence.

23.     During these parties, TD Chi, with the College's knowledge and permission, permits and distributes alcoholic beverages, and upon information and belief other unlawful substances, to its attendees, many of which are under the legal drinking age.

24.     In addition, TD Chi's all-male members control the admission of attendees, often choosing to permit female attendees solely based on their age, grade level, and/or appearance.

25.     Indeed, the members of TD Chi have been publicly described as "party animals" with a reputation that they "can't get laid consensually so [they] feel the need to spike drinks and pressure girls."

26.     Upon information and belief, the members of TD Chi hold a long-standing reputation for targeting female party-goers with spiked drinks in an effort to take advantage of them after the effects of the drugs and alcohol have set in – a practice commonly known as "date rape".

27.     The College was on notice of TD Chi's abhorrent and sexually violent behavior.

28.     Indeed, in 2013, TD Chi was found by the College to have engaged in, among other things, (i) disorderly conduct, (ii) failing to comply with the College's officials and policies, and (iii) "aggressive physical behavior" towards other students at the College.

29.     Despite this pattern of behavior, the College has done little to nothing to rectify TD Chi's fostering of sexually dangerous party culture, choosing instead to ignore the issue and allow its female students to assume the risk of becoming victims of sexual violence, assault, and harassment on and off campus.

30.     By way of example only, in response to the above-outlined finding against TD Chi, the College did nothing more than force TD Chi to move off campus. Notably missing from any punishment to TD Chi were measures directed at rectifying TD Chi's behavior and safeguarding the College's other students from falling victim to TD Chi's antics.

31.     In essence, in response to finding that TD Chi posed a safety risk to the College's students, the College's only solution was to turn a blind eye and tell TD Chi that it could continue victimizing students, just do it off campus.

**Plaintiff Prepares for the TD Chi Fraternity Party**

32.     That evening, as Plaintiff dressed to attend the party, she was offered vodka by one of the other women in her dorm. Plaintiff hesitated because she had not had much experience with alcohol in high school, but ultimately decided to accept the drink.

33.     Plaintiff drank one or two shots of straight vodka and then proceeded to the fraternity party.

34.     Plaintiff walked with her suitemate to the TD Chi fraternity house. The TD Chi fraternity party was located at an off-campus house which concerned Plaintiff because she had only recently arrived at the College and did not know her way around or back to campus.

35.     Upon arrival, Plaintiff noticed that the party was very crowded with loud music. She was shocked to learn that the *only* females allowed into the party were freshman girls.

36.     While at the TD Chi party, Plaintiff continued to drink more alcohol and estimates that she drank approximately two full cups of beer at the party.

**Plaintiff is Raped on Her Third Day at Defendant Union (the "Assault")**

37.     After a brief time at the TD Chi party, Plaintiff worked her way through the crowd towards the front door of the fraternity house to look for her friends. On her way, she asked a man "Assaulter Roe" [2], where the bathroom was located so she could stop at the restroom before she left.

38.     Assaulter Roe was a senior student at the College and was a member of the men's soccer team.

39.     Rather than simply provide directions to the bathroom, Assaulter Roe escorted Plaintiff to the bathroom to personally show her where it was. Plaintiff thanked him and entered the bathroom.

---

[2] For purposes of protecting the identity of Plaintiff's accused assaulter, Plaintiff shall refer to him by pseudonym.

40.     To Plaintiff's surprise, when she left the restroom Assaulter Roe was still outside waiting for her to exit. Plaintiff thought perhaps Assaulter Roe also needed to use the facilities and that is why he waited, but her assumption was proven wrong when Assaulter Roe began to make small talk with Plaintiff.

41.     Assaulter Roe began asking Plaintiff general questions about where she was from and talking about himself.

42.     At some point in the conversation, the subject of marijuana came up, and Plaintiff asked Assaulter Roe if he smoked, to which he replied affirmatively. Plaintiff stated she had smoked marijuana in the past but it had been weeks since she had done so. Assaulter Roe then invited Plaintiff back to his apartment to smoke marijuana with him.

43.     Plaintiff was apprehensive and tried to find where her friends were. She sent texts to her friends to see where they were located in the fraternity house; however, they responded that they had left the party.

44.     Plaintiff agreed to Assaulter Roe's invitation to go to his apartment to smoke; however, Plaintiff stated multiple times that she had a boyfriend and that she did not want Assaulter Roe to get the wrong idea. She said several times over that she only wanted to smoke and do nothing else.

45.     Assaulter Roe was openly annoyed at how many times Plaintiff repeated that she had a boyfriend, and replied to Plaintiff that "nothing was going to happen."

46.     Plaintiff told Assaulter Roe that she did *not* feel sober but thought she may be able to walk. Assaulter Roe then grabbed Plaintiff's hand and maneuvered them through the crowd to leave the party and go to his apartment.

47.     When Plaintiff and Assaulter Roe arrived at his apartment, they went to his room where he retrieved the marijuana. They then proceeded out onto Assaulter Roe's terrace.

48.     While on the terrace, Assaulter Roe packed the marijuana into the bowl of a pipe and Plaintiff smoked from the pipe.

49.     Plaintiff immediately felt the effects of the marijuana; it hit her hard and very quickly, unlike anything she had ever known before. Plaintiff suspected that there was something very different about this marijuana as it made her feel ill, a side effect she had not experienced previously.

50.     After smoking on the terrace, Assaulter Roe led Plaintiff back to his bedroom to watch television.

51.     Once in the room, Plaintiff, who was feeling confused, dizzy and uncoordinated, laid down on the bed. Plaintiff felt sleepy and disassociated from what was going on around her.

52.     Assaulter Roe then got onto the bed next to Plaintiff.  Assaulter Roe began to touch Plaintiff's breasts and put his hand down her pants.

53.     Plaintiff, who had already told Assaulter Roe multiple times at the party that she had a boyfriend and was not going to do anything except smoke with him, did not want Assaulter Roe to touch her and repeatedly told him "No".  Assaulter Roe would not stop.

54.     Plaintiff desperately wanted to push Assaulter Roe's hands away, but she lacked the ability and coordination to do so due to the combined effects of the alcohol she had consumed and the marijuana she had smoked. Plaintiff was incapacitated and felt unable to respond.

55.     Plaintiff recalled that she "was in a dream state," almost as though she was having an out of body experience. Plaintiff became numb and felt as though she was "unconscious but conscious."

56.     Assaulter Roe proceeded to take off his clothes and climb on top of Plaintiff.

57.     Plaintiff recalled her shirt was on, but her pants had been removed and pulled down around her ankles. Plaintiff could not remember how her clothing had come off and she had no memory of removing her clothing herself.

58.     Helpless to stop what came next, Plaintiff laid there unable to move as Assaulter Roe proceeded to vaginally penetrate her with his penis.

59.     Plaintiff was so shocked and scared at what was happening to her, it was as though she was paralyzed - unable to move her limbs, which felt heavy and limp - and helpless to stop Assaulter Roe from raping her.

60.     Plaintiff remained silent and stock still with her arms at her sides as Assaulter Roe continued to vaginally penetrate her and to have sexual intercourse with her without any indication by words or actions of Plaintiff providing effective affirmative consent. In fact, quite the opposite, Plaintiff had repeatedly told Assaulter Roe prior to the assault that she had no intention or desire to engage in any sexual activity, of any nature, with him.

61.     Plaintiff felt powerless to stop the Assault and could not respond to what was happening in any way. She was limp, void of feeling, confused, paranoid and scared; Plaintiff was alone and incapacitated in an apartment with a stranger as he forcibly raped her.

62.     After Assaulter Roe finished raping Plaintiff, he dressed and told Plaintiff she had to leave because he had early soccer practice in the morning.

63.     Plaintiff was desperate to escape Assaulter Roe's apartment but did not know where she was in relation to her dormitory.

64.     Plaintiff told Assaulter Roe that she wanted to go back to her room but did not know how to get there, so the two agreed that he would walk with her.

65.     On the walk to her dorm, Plaintiff told Assaulter Roe how mad she was about what had happened. Assaulter Roe did not seem to care.

66.     When she arrived at her building, Plaintiff went to her dorm room, immediately took a shower, and went to bed.

**Plaintiff Puts Defendant Union on Notice of the Assault and Identifies Her Assaulter**

67.     The following afternoon, Plaintiff attended a Title IX First Year orientation session given by Defendant Kelley, the College's Title IX Coordinator.

68.     Plaintiff went to speak with Defendant Kelley immediately following the Title IX orientation session and scheduled an appointment to meet with Defendant Kelley one on one.

69.     Plaintiff met with Defendant Kelley that same afternoon. At such time, Plaintiff reported to Defendant Kelley that she had been sexually assaulted the night prior and identified Assaulter Roe as her rapist.

70.     Accordingly, Plaintiff placed Defendants on notice that she was a victim of sexual assault by one of Defendant Union's upperclassmen, and Defendants were aware of who exactly had perpetrated the rape against Plaintiff.

71.     Plaintiff reasonably believed that informing the College's Title IX Coordinator would be sufficient to alert and be protected by the College.

72.     Plaintiff reasonably expected that Defendant Kelley would take action after learning that one of the College's students – Plaintiff - had been raped by a classmate.

73.     As stated in Defendant Union's Policy (defined below), Defendant Kelley was and is a mandatory reporter and therefore had an obligation to report Plaintiff's allegations of rape to the proper authorities and to investigate the merits of Plaintiff's report.

74.     However, in response to Plaintiff's sexual assault report, all that Defendant Kelley did was instruct Plaintiff to contact the College's Wicker Wellness Center (the "Center").

75.     Upon information and belief, Defendant Kelley did not take any further steps to investigate Plaintiff's sexual assault complaint, nor did she take any steps to report the rape to the proper authorities either internally or outside of the College.

76.     In essence, Defendant Kelley ignored the fact that Plaintiff had been raped by one of the College's students leaving Plaintiff to fend for herself.

**Plaintiff Visits Defendant Union's Wellness Center**

77.     Plaintiff followed Defendant Kelley's advice and visited the Center.

78.     When Plaintiff visited the Center, she was provided with the emergency contraceptive pill "Plan B", and was given medication to prevent and treat sexually transmitted diseases.

79.     Plaintiff continued to feel distraught and anxious over the next two days.

80.     On or about September 6, 2017, Plaintiff went to the hospital accompanied by a staff member from the Center.

81.     At some point during the day, the Center representative left Plaintiff at the hospital and was replaced by a representative from Planned Parenthood who stayed with Plaintiff for the remainder of the day.

82.     Plaintiff was terrified. Accompanied by strangers, she was essentially alone in a hospital, having a full vaginal examination after she had been raped.

**Plaintiff Spends Her First Semester Living in Fear**

83.     Aside from directing Plaintiff to the Center, upon information and belief, Defendant Kelley did not take any steps to investigate the credible report of sexual assault made by Plaintiff following orientation, and did nothing to help safeguard Plaintiff while she remained on campus with her rapist.

84.     Pursuant to Defendant Union's Policy for Administrative Complaints (the "Administrative Policy"), Defendant Kelley could have initiated an investigation into the Assault after receiving Plaintiff's report in September.

85.     Indeed, the Administrative Policy provided, in relevant part, that the College "may independently initiate a disciplinary complaint against a student under this policy. In this type of Administrative Complaint, the College will act as the Complainant in the adjudication of a sexual misconduct complaint against a student… when the conduct at issue involves a threat to the campus safety."

86.     Defendants knew the identity of Plaintiff's assaulter and, instead of initiating the necessary investigation, purposefully refused to take any action, thus allowing Plaintiff's assaulter to further harass and torment Plaintiff on campus.

87.     Indeed, Assaulter Roe made several attempts to contact Plaintiff following the Assault and went so far as to silently mock Plaintiff on campus.

88.     By way of example only, Assaulter Roe attempted to make contact with Plaintiff on various social media websites on the day following the Assault; however, Plaintiff blocked him from contacting her.

89.     Assaulter Roe would not be deterred – after Plaintiff blocked him on social media sites, he continued to send her harassing text messages. Plaintiff refused to answer him.

90.     Not long after the Assault, Plaintiff ran into Assaulter Roe on campus. When Assaulter Roe saw Plaintiff, he snidely smirked at her. Plaintiff felt humiliated and afraid.

91.     Plaintiff spent her first college semester following the Assault feeling depressed and despondent. She began to struggle in her classes and was forced to drop one course.

92.     Following her first semester at the College, Plaintiff returned to her home to begin treatment with a therapist and to get medication to manage her anxiety and depression.

**Defendant Union's Checkered Past with Title IX Complaints**

93.     Approximately three (3) years prior to Plaintiff's Assault, on or about September 16, 2015, the U.S. Department of Education Office for Civil Rights ("OCR") opened an investigation into a complaint filed against Defendant Union for its alleged mishandling of a complaint of sexual assault.

94.     Specifically, on or about July 30, 2015, the OCR received a complaint regarding the failure of Defendant Union to provide a prompt and equitable response to an allegation of sexual assault.

95.     The OCR determined, because Defendant Union is a recipient of federal financial assistance, that the OCR had jurisdiction to pursue an investigation, not only of the July 30, 2015 complaint, but into "whether the college promptly and equitably responded to all complaints, reports, and/or incidents of sexual assault/violence of which it had notice; and as a result, students at the College, including the complainant, were subjected to a sexually hostile environment."

96.     The 2015 OCR investigation is currently ongoing.

**Plaintiff Files a Formal Complaint with the College
And Learns of the College's Title IX Related Policies and Procedures**

97.     After months of debilitating anxiety and depression, Plaintiff decided that she could no longer continue her education at Defendant Union while living in fear of her rapist being on the same campus.

98.     Although Plaintiff was reluctant to speak about the sexual assault out of fear of having to admit she was a rape victim, Plaintiff ultimately decided to meet with the Title IX Office for a second time.

99.     Accordingly, on or about January 16, 2018, after Plaintiff returned to Defendant Union following winter break, she and her mother met with Defendant Kelley, the Director of Campus Safety, and Defendant Williams, to file a formal Title IX complaint with the College against Assaulter Roe.

100.     At such time, Defendant Kelley, who had been aware of Plaintiff's rape for the prior four (4) months, spoke to Plaintiff about the process of filing a Title IX complaint and the potential avenues for relief available to Plaintiff.

101.     Plaintiff was also provided with the 2017-2018 Union College Sexual Misconduct Policy (the "Policy").

**<u>Defendant Union's Policies and Procedures Related to Title IX</u>**

102.     The Policy provided, in relevant part:

> *I.     Sexual or Gender-Based Harassment*
>
> A single isolated incident may create a hostile environment if the incident is sufficiently severe, particularly if the conduct is physical. A single incident of Sexual Assault, for example, may be sufficiently severe to constitute a hostile environment.
>
> *II.     Sexual Assault*
>
> Sexual Assault is having or attempting to have sexual intercourse with another individual:

- By force or threat of force;
- Without effective affirmative consent; or
- When that individual is incapacitated.

Sexual assault refers to any sexual penetration (anal, oral, or vaginal), however slight, with any object, or sexual intercourse by a man or woman upon a man or woman without consent. Sexual penetration includes vaginal or anal penetration by a penis, tongue, finger, or object or oral copulation by mouth to genital contact or genital to mouth contact.

### III.   Key Terms: Affirmative Consent, Force, Intimidation, Coercion, Incapacitation

#### 1.   Affirmative Consent

Under New York law, affirmative consent means: knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

- Consent to any sexual act or prior consensual sexual activity between or with any party does not necessarily constitute consent to any other sexual act.
- Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.
- Consent may be initially given but withdrawn at any time.
- Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.
- Consent cannot be given when it is the result of any coercion, intimidation, force, or threat of harm.
- When consent is withdrawn or can no longer be given, sexual activity must stop.

### 2.   *Force*

Force is the use or threat of physical violence to overcome an individual's freedom of will to choose whether or not to participate in sexual activity or provide consent. Consent obtained by force is not valid. For the use of force to be demonstrated, there is no requirement that a Complainant resists the sexual advance or request. However, evidence of resistance by the Complainant will be viewed as a clear demonstration of a lack of consent.

### 3.   *Intimidation*

Intimidation is the use of implied threats to overcome an individual's freedom of will to choose whether or not to participate in sexual activity or provide consent. Consent obtained by intimidation is not valid.

### 4.   *Coercion*

Coercion is the improper use of pressure to compel another individual to initiate or continue sexual activity against that individual's will. Consent obtained through coercion is not valid.  Coercion can include a wide range of behaviors, including intimidation, manipulation, threats, and blackmail. A person's words or conduct are sufficient to constitute coercion if they wrongfully impair another individual's freedom of will and ability to choose whether or not to engage in sexual activity. Examples of coercion include threatening to "out" someone based on sexual orientation, gender identity, or gender expression and threatening to harm oneself if the other Party does not engage in sexual activity. When someone indicates, verbally or physically, that they do not want to engage in a particular sexual activity, that they want to stop a particular activity, or that they do not want to go past a certain point of sexual interaction, continued activity or pressure to continue beyond that point can be coercive. The College will evaluate the following in determining whether coercion was used: (a) the frequency of the application of
pressure, (b) the intensity of the pressure, (c) the degree of isolation of the person being pressured, and (4) the duration of the pressure.

### 5.   *Incapacitation*

Incapacitation is a state where an individual cannot make an informed and rational decision to engage in sexual activity because of a lack of conscious understanding of the fact, nature, or extent of the act (e.g., to understand the who, what, when, where, why, or how of the sexual interaction) and/or is physically helpless. For example, an individual is incapacitated, and therefore unable to give consent, if

the individual is asleep, unconscious, or otherwise unaware that sexual activity is occurring. An individual will also be considered incapacitated if the person cannot understand the nature of the activity or communicate due to a mental or physical condition. Incapacitation may result from the use of alcohol, drugs, or other medication. Consumption of alcohol or other drugs alone is insufficient to establish incapacitation.

The impact of alcohol and drugs varies from person to person, and evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs impacts an individual's:

> (1) decision-making ability;
> (2) awareness of consequences;
> (3) ability to make informed judgments; or
> (4) capacity to appreciate the nature and the quality of the act.

It shall not be a valid excuse that the Respondent believed that the Complainant affirmatively consented to the sexual activity if the Respondent knew or reasonably should have known that the Complainant was unable to consent to the sexual activity under any of the following circumstances:

> (a) the Complainant was asleep or unconscious;
> (b) the Complainant was incapacitated due to the influence of drugs, alcohol, or medication so that the Complainant could not understand the fact, nature, or extent of the sexual activity;
> (c) the Complainant was unable to communicate due to a mental or physical condition. (*emphasis supplied*)

Whether the Respondent reasonably should have known that the Complainant was incapacitated will be evaluated using an objectively reasonable person standard. The fact that the Respondent was actually unaware of the Complainant's incapacity is irrelevant to this analysis, particularly where the Respondent's failure to appreciate the Complainant's incapacitation resulted from the Respondent's failure to take reasonable steps to determine the Complainant's incapacitation or where the Respondent's own incapacitation (from alcohol or drugs) caused the Respondent to misjudge the Complainant's incapacity.

It is the responsibility of each Party to be aware of the intoxication level of the other Party before engaging in sexual activity. In general, sexual activity while under the influence of alcohol or other drugs poses a risk to all Parties. If there is

any doubt as to the level or extent of the other individual's intoxication, it is safest to forgo or cease any sexual contact or activity.  Being intoxicated by drugs or alcohol is no defense to any violation of this Policy and does not diminish one's responsibility to obtain consent.

## IV.   *Sexual Misconduct Adjudication Process*

Formal Resolution of a complaint under this policy will occur through the use of an Adjudication Panel. A brief outline of the process is provided below. A description of each step in the process is outlined thereafter.

1. Initiating the Disciplinary Process
2. Responding to a Disciplinary Complaint
3. Fact Finding Investigation
4. Investigative Report
5. Document Review
6. Notice of Charges
7. Notice of Adjudication
8. Panel Adjudication/Decision
9. Sanctions
10. Outcome Letter
11. Appeals
12. Concerns about the Implementation of this Policy
13. Integrity of Process
14. Conclusion of Case

### a)  *Complainant's Statement*

For a Complainant to file a disciplinary complaint against a student, the Complainant must submit a written statement detailing the allegations of sexual misconduct. This statement is the first opportunity for the Complainant to describe the allegations against the Respondent…. The Complainant's Statement is one of the most important documents to be considered in the Sexual Misconduct Adjudication Process…. The Respondent will not be allowed to see the Complainant's Statement until after the Respondent has filed their statement in response to the original Complaint Form. Once the Respondent has submitted their statement, they will be given a copy of the Complainant's Statement. The Complainant will also be given a copy of the Respondent's Statement.  (emphasis original)

### b)  *Respondent's Statement*

If the Respondent does not accept responsibility, they will be asked to provide a written response to the information contained in the Complaint Form. The

Respondent's Statement must be submitted to the Title IX Coordinator within seven (7) days after the meeting with the Title IX Team.

**Defendants Initiate an Investigation into Plaintiff's Title IX Complaint**

103.    On or about January 18, 2018, Defendants issued a No Contact Order between Plaintiff and Assaulter Roe.

104.    Thereafter, on or about January 22, 2018, Plaintiff submitted a written statement to Defendants regarding her Title IX complaint against Assaulter Roe.

105.    On or about January 29, 2018, after being given an opportunity to review Plaintiff's statement – a blatant violation of the College's Policy, Assaulter Roe submitted his own written statement in rebuttal.

106.    Thereafter, Defendant Kelley assigned two investigators, Associate Director of Minerva Programs, Laura Munkes, and Associate Director of Campus Safety, Thomas Constantine (collectively "Investigators Munkes and Constantine"), to investigate Plaintiff's Title IX complaint.

107.    Upon information and belief, Investigators Munkes and Constantine began the investigation by interviewing pertinent witnesses.

108.    Curiously, although it was *her* complaint, Investigators Munkes and Constantine, upon information and belief, intentionally, chose not to interview Plaintiff first.

109.    Investigators Munkes and Constantine, without having interviewed the complainant to learn the details of her complaint, determined to first interview the respondent, Assaulter Roe.

110.    Indeed, on or about the morning of February 8, 2018, Investigators Munkes and Constantine met and interviewed Assaulter Roe, who appeared with his advisor.

111.   Investigators Munkes and Constantine did not meet with Plaintiff until the afternoon of February 8, 2018, <u>after</u> they had interviewed Assaulter Roe.

112.   Investigators Munkes and Constantine, upon interviewing Plaintiff to learn the details of the sexual assault, never followed up to interview Assaulter Roe a second time to question him about the many contradictions to his earlier statement.

113.   Indeed, even after interviewing Plaintiff and non-party witnesses, Investigators Munkes and Constantine still did not conduct any follow-up interview with Assaulter Roe.

114.   Evidently, Investigators Munkes and Constantine accepted as undisputed fact Assaulter Roe's version of the events without requiring a second interview, after having received contradictory reports from the complainant and witnesses.

115.   With respect to witnesses, Investigators Munkes and Constantine interviewed, among other individuals, two of Assaulter Roe's witnesses, his housemate, and a friend, on the same day following Plaintiff's interview.

116.   Both witnesses identically recalled that on the night of September 3, 2017, more than five (5) months prior, they had seen Assaulter Roe walking with Plaintiff at "around 1:00 a.m.", corroborating Plaintiff's story of events on the night of the Assault.

117.   Investigators Munkes and Constantine also interviewed several of Plaintiff's witnesses[3].

118.   Witness "EM" had been with Plaintiff on the night of the Assault and had witnessed Plaintiff's alcohol consumption on the night of the Assault. In addition, Witness EM had texted Plaintiff during the TD Chi party in an attempt to meet up with one another.

---

[3] For privacy purposes, the witnesses shall be named herein by initials only.

119.    Moreover, Witness EM was the first person to whom Plaintiff disclosed the Assault, and Witness EM had accompanied Plaintiff to meet with Defendant Kelley to disclose her sexual assault months prior to the investigation.

120.    The second witness, Witness "LH", recalled to Investigators Munkes and Constantine how Plaintiff had disclosed to her that she had been raped by Assaulter Roe. Notably, the details provided by Witness LH were consistent with the events and details described by Plaintiff during her interview.

**Investigators Munkes and Constantine Issue a Final Investigative Report**

121.    On or about February 23, 2018, Investigators Munkes and Constantine delivered their final investigative report (the "Report") to Defendant Williams for review.

122.    Notably, Investigators Munkes and Constantine intentionally misrepresented the nature and chronology of the investigation, upon information and belief, in an attempt to make it appear fairer towards Plaintiff.

123.    By way of example only, despite having interviewed Plaintiff (the complainant) and Assaulter Roe (the respondent) out of logical order, in the interview summaries included in the Report, Investigators Munkes and Constantine presented the interviews in reverse order, suggesting that Plaintiff had been interviewed first and Assaulter Roe had responded to the complainant's allegations.

124.    Moreover, in the Report, Investigators Munkes and Constantine completely disregarded contradictions and inconsistencies in Assaulter Roe's statements in order to determine him more credible than Plaintiff.

125.    In addition, in the Report, Investigators Munkes and Constantine improperly excluded relevant information and mischaracterized key testimony provided by Plaintiff regarding the Assault.

126.    By way of further example, the Report indicated that Assaulter Roe had been less than forthcoming with Investigators Munkes and Constantine. Indeed, the Report evidenced that Assaulter Roe had submitted only selected text messages that he had sent to Plaintiff on the day following the Assault.

127.    Notably, Assaulter Roe excluded the message to Plaintiff stating that he was "sorry." In defense of this obvious omission, Assaulter Roe claimed that his phone lacked storage and the phone had deleted that one particular message, but, curiously, had retained all of the other messages that he had wanted to share with Defendants during the investigation.

128.    The Report was delivered to Defendant Williams, whose responsibility it was to arrange for separate reviews of the report by Plaintiff and Assaulter Roe.

129.    Instead of reviewing and flagging the many flaws made in the Report, Defendant Williams accepted the flawed and incomplete Report without hesitation.

130.     On or about February 27, 2018, Plaintiff scheduled a review of the Report with her advisor attending remotely via Zoom, a video conferencing program, as facilitated by Defendant Williams.

131.    During the review, Plaintiff's advisor objected to the lack of audio and the poor visual quality of the report over Zoom.

132.    Plaintiff's advisor's complaints were summarily dismissed as Defendant Williams stated there was nothing she could, or would, do to correct the problem.

133.    Plaintiff was forced to review the Report virtually on her own without the ability to effectively and sufficiently consult her advisor. As a result, during the review, Plaintiff suffered a severe anxiety attack while reading the Report and she had difficulty completing her review.

134.    On or about March 1, 2018, Plaintiff submitted a written response to the Report with corrections and clarifications.

135.    By way of example only, among Plaintiff's corrections, Plaintiff wrote, "[t]he reports says, 'As far as pants go, [Plaintiff] initially stated 'I never fully took them off.'  What I had said during the interview was that *I wasn't sure who took my pants off* and *I don't think it was me.* My actual statement was '*My pants were around my legs and never fully taken off*.'

136.    Additionally, by way of further example, Plaintiff had stated during her interview with the investigators, regarding Assaulter Roe's claims that it had been a consensual encounter, *"I know I never would have done that. I would never hook up with a random person."*

**Defendants Force Plaintiff to Participate in a**
**Procedurally Improper Evidentiary Conference**

137.    On or about March 9, 2018, Defendant Union issued a Charge Letter stating that Assaulter Roe was charged with violating the Policy, specifically Sexual Assault.  The letter stated, in relevant part:

> "The Union College Sexual Misconduct Policy defines Sexual Assault as:
>
> Having or attempting to have sexual intercourse with another individual by force or threat of force; without effective affirmative consent; or when that individual is incapacitated. Sexual assault refers to any sexual penetration (anal, oral, or vaginal) however slight, with any object, or sexual intercourse by a man or woman upon a man or woman without consent. Sexual penetration includes vaginal or anal penetration by a penis, tongue, finger, or object or oral copulation by mouth or genital contact or genital to mouth

contact."

138.     On or about April 24, 2018, Plaintiff attended a pre-decision conference (the "Complainant Conference") during which time she met with the Hearing Panel. Upon information and belief, Defendant Union also holds a pre-hearing conference with the respondent in any Title IX matter.

139.     Upon information and belief, the purpose of the pre-decision conferences was to review the evidence and allow the Hearing Panel to make an ultimate finding as to whether Assaulter Roe violated the Policy when he sexually assaulted Plaintiff.

140.     The College's Policy required that "[p]resent at the Pre-Decision Conference will be the Complainant and their advisor or the Respondent and their advisor as well as the Administrative Panel members, the Title IX Coordinator (in this case Defendant Kelley), and/or College counsel. College counsel may not be present during the Pre-Decision Conference, however, the Panel Chair reserves the right to consult at any time."

141.     Significantly, both College Counsel and Defendant Kelley were absent from the Complainant Conference. Indeed, the Hearing Panel members consisted of only the Associate Dean of Students as a voting Chair, two faculty members, the Director of Residential Life, and a sophomore student.

142.     Notably, the Complainant Conference began fifteen (15) minutes late because the student panelist was not timely in attendance. Even more egregious, when he finally arrived and joined the Complainant Conference, he had no hearing packet or documentation with him.

143.     Moreover, throughout the Complainant Conference, the student panelist failed to take any notes, looked extremely confused about what his role was, what was going on, or why he was there and did not speak or ask a single question during the proceedings.

144.    As the Complainant Conference began, the Chair read to Plaintiff from a script stating, "Okay in front of you is the investigative report and any other documents associated with the case.  The panel has been given substantial time to review these documents and is prepared to proceed."

145.    Plaintiff immediately interjected and informed the Chair that neither she nor her advisor had any such documents in front of them. Defendants had utterly failed to provide Plaintiff with a hearing packet, nor any of the documents that had been provided to the panel.

146.    Such materials were vital and necessary for Plaintiff to have and use during the Complainant Conference to support her allegations against Assaulter Roe and to answer any questions the Hearing Panel may have regarding the Assault and the investigation.

147.    Despite being apprised that Plaintiff was not provided the necessary and mandatory materials, Defendants refused to provide Plaintiff with a copy of the materials, refused to adjourn the Complainant Conference to a date when the materials would be available to Plaintiff, and forced Plaintiff to proceed with the Complainant Conference at a significant disadvantage.

148.    The Hearing Panel proceeded to question Plaintiff for one and a half hours about the Assault and the events of that night.

149.    Throughout their interrogation of Plaintiff, the panelists repeatedly referenced the Report and the evidence of the investigation, knowing that Plaintiff was without the ability to review the evidence they were referencing yet still expecting her to testify and respond to their multiple questions.

150.    On or about April 25, 2018, the day following the Complainant Conference, Assaulter Roe met for a pre-decision conference before the same Hearing Panel (the "Respondent Conference").

151.    At the Respondent Conference, Assaulter Roe was provided with the complete hearing packet of documents at the start of the conference. Assaulter Roe was even given an opportunity to provide more documentation and evidence.

152.    Unsurprisingly, Assaulter Roe took full advantage of the liberties allowed to him by the panelists and proceeded to give a lengthy opening statement, immediately giving his version of events in rebuttal to information contained in the Report, namely Plaintiff's statements.

153.    By way of example, Assaulter Roe addressed the Hearing Panel and stated that Plaintiff went from annoying him by repeating that she had a boyfriend to suddenly, after smoking the marijuana he had provided to her, responding "Sure!!!" when he asked her to have sex.

154.    By way of further example, Assaulter Roe repeatedly stated to the Hearing Panel, wrongly, that Plaintiff claimed she had been "frozen" during the incident. Notably, Plaintiff had never used the term "frozen," nor had she made any assertions to being "frozen."

155.    Nonetheless, Assaulter Roe mischaracterized Plaintiff's statement to the investigators and went so far as to submit for the Hearing Panel's consideration an unsolicited letter from a local psychologist discussing "tonic immobility," in a generalized statement with no footnotes or attached data and without the benefit of having interviewed Plaintiff or any witnesses or having had any involvement with the matter contemporaneous to the Assault[4].

---

[4] In response to Assaulter Roe's letter from the local psychologist about a claim which Plaintiff had never made, Plaintiff submitted a letter from a nationally recognized psychiatrist, certified by the American Board of Psychiatry

156.    Following Assaulter Roe's opening verbal rebuttal of the Report, the Chair moved to pose questions to Assaulter Roe.

157.    Prior to the Respondent Conference, Plaintiff had submitted questions to be asked of Assaulter Roe, in accordance with the Policy.

158.    The Chair, evidently uncomfortable with the number of questions submitted by Plaintiff, made sure to let Assaulter Roe know it was not Defendants who were asking the following questions and went so far as to infer that the questions posed by Plaintiff were irrelevant.

159.    Specifically, the Chair instructed Assaulter Roe to, "[p]lease keep in mind that the following questions are questions from the complainant and not from the panel members. And I do want to add here, there are a lot of questions. Uh, you may question the relevancy of some of them, and I just want to let you know that when we get into the deliberation phase of this particular case from these questions, uh, and the relevancy may turn out not to matter at all."

160.    The Chair and other panel members apologetically, repeatedly and excessively, explained to Assaulter Roe that they had to ask Plaintiff's submitted questions only because they had been legally advised to do so.

161.    The Chair then read the definition of incapacitation from the Policy to Assaulter Roe and asked if he recognized the definition as true.

162.    Assaulter Roe said he wasn't sure and so the Chair read the definition again, slowly. The Chair apologized that he could not do more than read the definition as a question.

163.    Assaulter Roe was still uncertain and ultimately responded that he did not understand the definition of incapacitation.

---

and Neurology in Psychiatry and in Child & Adolescent Psychiatry, regarding reduced physical response as a common response in matters of human trauma. Ultimately, the panelists reviewed the letters submitted by Assaulter Roe and Plaintiff but stated they did not consider the information in their determination.

164.    Assaulter Roe later stated that he had completed at least five (5) Title IX trainings at Defendant Union and knew the Policy the definitions for "incapacitation" and "consent."

165.    In reality, Assaulter Roe failed to demonstrate any basic knowledge of the Policy's definition for "effective affirmative consent." As it applied to his sexual encounter with Plaintiff, Assaulter Roe explained consent as only the absence of a "no" when engaging in sexual activity. Notably, the absence of a "no" is not the definition of effective affirmative consent according to the Policy.

166.    Assaulter Roe further claimed to know many of the people at the crowded fraternity party the night of the Assault and yet, when pressed, could not name a single witness from the party who might have been able to corroborate his story of events as he had described them, a story which directly contradicted Plaintiff's statements throughout the investigation.

167.    During the Respondent Conference, Assaulter Roe further contradicted himself when it came time to describe the Assault itself.

168.    By way of example, in one instant, Assaulter Roe agreed with Plaintiff's account that she had lain on his bed with her arms at her sides and had not touched him throughout his vaginal penetration of her. Later, however, Assaulter Roe contradicted himself and stated that Plaintiff took his penis in her hand and guided him inside her.

169.    Assaulter Roe concluded the Respondent Conference by addressing the panel with an impact statement.

170.    Upon information and belief, an impact statement is only read and considered by most educational institutions during the sanctioning phase of adjudication, *after* a decision has been rendered determining responsibility.

171.    In Defendants' procedurally flawed process, however, Assaulter Roe was prematurely allowed to address the panel and persuade the panelists to conclude that he was not responsible for sexual assault because the accusation had caused him to lose weight and allegedly resulted in a "focal seizure that was directly caused by a high increase in stress and lack of sleep."  Notably, Assaulter Roe described the medical saga of his diagnosis without providing any documentary evidence to back up his claims.

**Plaintiff Is Permitted to Review and Correct the Conference Transcripts**

172.    On or about May 3, 2018, each of the parties received copies of the hearing transcripts from the two pre-decision conferences. As per the Policy, each party had an opportunity to respond in writing with corrections or comments to the transcripts.

173.    Plaintiff timely submitted twelve (12) written pages of corrections to her own transcript from the Complainant Conference and response to Assaulter Roe's opening statement and his answers to her submitted questions as provided in the transcript of the Respondent Conference.

174.    Upon information and belief, Plaintiff's transcript corrections and response to Assaulter Roe's transcript were simply added as an addendum to the hearing packet and not incorporated to make actual corrections to the many significant errors and contradictions in the hearing transcripts.

175.    Significantly, Plaintiff was not provided with Assaulter Roe's comments or revisions to his transcript from the Respondent Conference, nor his comments and response(s) to Plaintiff's transcript from the Complainant Conference.

176.    This egregious error denied Plaintiff access to all documentation considered by Defendants in the determination of Assaulter Roe's culpability.

**The Hearing Panel Clears Assaulter Roe of Any Wrong-Doing**

177.    On or about May 15, 2018, Plaintiff received an email stating that the Hearing Panel had completed its "deliberations and write up" the previous day.

178.    Defendant Kelley scheduled a meeting for May 22, 2018, with Plaintiff and her advisor to inform them of Defendants' decision.

179.    Upon information and belief, Assaulter Roe had been informed of the determination one or more days prior to the May 15th notice to Plaintiff, and not "at or near the same time" as required by the Policy.

180.    Ultimately, Defendants found Assaulter Roe "not responsible" by a vote of 3-2.

181.    In support of its finding, the panel relied upon inaccurate sources which had previously been amended and corrected, and misquoted statements in the Report and conference transcripts – errors which had been corrected by Plaintiff in her responses to the Report and her hearing transcript, but which had obviously not been incorporated into those documents nor substantively considered by Defendants.

182.    Defendants further rationalized that the Hearing Panel had not been unanimous in their final determination regarding Plaintiff's incapacitation at the time of the Assault because, in the Hearing Panel's opinion, Plaintiff could not have been incapacitated by a "small amount of marijuana."

183.    The panel's unfounded conclusion that Plaintiff simply could not be incapacitated by a "small amount of marijuana" was directly contradicted by Plaintiff's own testimony.

184.    In failing to find Plaintiff was incapacitated at the time of the Assault, the panel majority blatantly failed to take into consideration the potency of the marijuana provided by

Assaulter Roe to Plaintiff, and Plaintiff's repeated testimony that she could not recall how her pants came off and was physically unable to move while Assaulter Roe raped her.

185.     Moreover, in clearing Assaulter Roe of any wrongdoing, the panel failed to apply Defendant Union's Policy which states, in pertinent part:

> "Whether the Respondent reasonably should have known that the Complainant was incapacitated will be evaluated using an objectively reasonable person standard. The fact that the Respondent was actually unaware of the Complainant's incapacity is irrelevant to this analysis, particularly where the Respondent's failure to appreciate the Complainant's incapacitation resulted from the Respondent's failure to take reasonable steps to determine the Complainant's incapacitation or where the Respondent's own incapacitation (from alcohol or drugs) caused the Respondent to misjudge the Complainant's incapacity."

186.     Throughout the Respondent Conference, Assaulter Roe demonstrated a breathtaking inability to provide even the most general understanding of what "effective affirmative consent" and "incapacitation" meant, even after portions of the Policy were read aloud to him.

187.     Indeed, Assaulter Roe went so far as to corroborate Plaintiff's testimony that she was physically incapacitated at the time he vaginally penetrated her.

188.     Still, despite damning testimony from both the complainant and respondent, Defendants *still* found that Plaintiff was not incapacitated at the time of the Assault.

**Defendants Rationalize the Plaintiff Consented to Being a Victim of Sexual Assault**

189.     Despite all the evidence to the contrary, Defendants found Assaulter Roe not responsible for raping Plaintiff and engaged in poorly veiled victim shaming, embarrassing and degrading Plaintiff even further.

190.    Indeed, in its rationale, the Hearing Panel stated that: "We believe [Plaintiff] feels she was victimized, <u>and the panel unanimously agrees that this is a valid feeling on her part</u>.  We feel it is possible for someone to give consent and still feel "used" after a sexual encounter."

191.    Incredulously, the Hearing Panel determined Plaintiff properly felt, and was, a victim of sexual assault, but that she had agreed to being victimized, "used", and abused for Assaulter Roe's own desires.

192.    The Hearing Panel's actions directly violated Defendant Union's Sexual Misconduct Bill of Rights, which stated, in relevant part: "If you file a report of sexual misconduct (the complainant), you have the right to [b]e free from any suggestion that you are at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations."

**<u>Plaintiff Appeals the Hearing Panel's Determination</u>**

193.    Following the Hearing Panel's determination, Plaintiff repeatedly requested information from Defendant Kelley about the Title IX appeal process.

194.    Curiously, however, Defendant Kelley refused to respond to Plaintiff and Plaintiff was forced to navigate the appeal's process on her own.

195.    On or about May 31, 2018, Plaintiff submitted her appeal of the Hearing Panel's decision finding Assaulter Roe "not responsible."

196.    At the time Plaintiff submitted her appeal, she was unaware of who would be serving on the appeal panel.

197.    Not knowing who the members of the appeal panel were, Plaintiff feared there may be a conflict of interest that would taint the determination of her appeal.

198.    Plaintiff tried to engage Defendant Kelley for information but was summarily shot down; Defendant Kelley refused to disclose the identities of the three (3) members on the appeal panel and exclaimed that only the appeal panel members would get to decide if there is a conflict of interest with any of the involved parties.

199.    While her appeal was pending, Plaintiff made a formal request to be provided with Assaulter Roe's response to her appeal but Defendant Kelley, without explanation, failed to timely send his response.

200.    Indeed, Defendant Kelley did not provide Plaintiff with a copy of Assaulter Roe's response to Plaintiff's appeal until June 6, 2018, after the appeal panel had already deliberated, foreclosing any possibility for Plaintiff to rebut Assaulter Roe's response to her appeal.

201.    All Plaintiff could do at that point was to sit and wait to receive notice of the outcome of her appeal.

**Defendants Reject Plaintiff's Appeal**

202.    On or about June 11, 2018, Plaintiff received a letter from Defendant Czajka, Union's Chief of Staff. At that time, Plaintiff was notified that Defendant Czajka had served as Chair of the Appeals Panel.

203.    Notably, OCR's September 2017 "Q&A on Campus Sexual Misconduct" cautioned schools to "avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication."

204.    Nevertheless, Defendant Union chose its president's chief of staff, an individual whose role is to protect institutional interests, as chair of the appeals panel adjudicating Plaintiff's appeal.

205.    It was immediately clear that Defendant Czajka had not bothered to properly review the materials underlying Plaintiff's appeal, nor had she even conducted a cursory review of the evidence in Plaintiff's Title IX matter.

206.    By way of example only, in Defendant Czajka's appeal determination, Defendant Czajka stated that "the transcript shows that you (Plaintiff) were provided a copy of the documents to reference at the [Complainant C]onference."

207.    However, the record clearly indicated that Plaintiff was <u>not</u> provided a copy of the documents to reference at the Complainant Conference.

208.    Indeed, Defendants' failure to provide the necessary materials was noted in (i) the transcript of the Complainant Conference, the very transcript Defendant Czajka allegedly used to support the notion that Plaintiff <u>was</u> provided the necessary materials; (ii) Plaintiff's written response to the Complainant Conference transcript; and (iii) Plaintiff's written appeal of the Hearing Panel's decision.

209.    Defendant Czajka continued on to address, and summarily dismiss all of the valid points raised in Plaintiff's appeal.

210.    In response to Plaintiff's contention that the student panelist had not been prepared nor did he participate in the Complainant Conference, Defendant Czajka weakly replied that "participation in conferences varies by participant" and that "based on review of the policy we do not believe you have set forth a procedural violation."

211.    In response to Plaintiff's concerns that Assaulter Roe had claimed he had reviewed Plaintiff's statement prior to submitting his own statement, against Policy guidelines, Defendant Czajka asserted that "the respondent clarified this in his transcript comments submitted after his review of his transcript."

212.    Respondent's transcript comments, however, were never provided to Plaintiff. This was yet another example of Defendants' practice of denying Plaintiff full and fair access to her own complaint file and using documentation, which she was intentionally not privy to, against her.

213.    In conclusion, Defendant Czajka denied Plaintiff's appeal and upheld the Hearing Panel's finding for Assaulter Roe.

214.    Following the appeal, there were no further avenues of recourse for Plaintiff as a rape victim at Union.

**Defendants' Ongoing Violations of the
2013 Reauthorization of the Violence Against Women Act**

215.    Throughout the entire investigation and adjudication of Plaintiff's Title IX complaint, Defendants repeatedly violated not only their own policies and representations to Plaintiff as a student of Defendant Union but also the 2013 Reauthorization of the Violence Against Women Act ("VAWA").

216.    Defendant Union's Policy and procedures failed to meet the mandates outlined in VAWA which requires institutions to provide for a prompt, fair, and impartial disciplinary proceeding, and which requires, in relevant parts that:

    a.    Officials are appropriately trained and do not have a conflict of interest or bias for or against the accuser or the accused;

    b.    the accuser and the accused receive simultaneous notification, in writing, of the result of the proceeding and any available appeal procedures;

    c.    the proceeding is completed in a reasonably prompt timeframe; and

d.  <u>the accuser, the accused, and appropriate officials are given timely and equal access to information</u> that will be used during informal and formal disciplinary meetings and hearings.

217.  Defendants failed to meet the requirements of the VAWA when among other things:

a.  Defendants' Title IX Coordinator appointed to the Hearing Panel a student member who had not been appropriately trained, or evaluated for proficiency after training had been provided;

b.  Defendants prohibited disclosure to Plaintiff of the members of the appeals panel, barring her from citing any conflicts of interest;

c.  Defendants appointed its Chief of Staff as Chair of the appeals panel, in a biased manner, as the chief of staff was not a neutral party but protector of Defendant Union's institutional interests;

d.  Defendant Union failed to provide simultaneous notice of the outcome to both parties, having informed Assaulter Roe of the decision one or more days prior to notifying Plaintiff;

e.  The proceeding, which began in January of 2018 and concluded in June of 2018, far exceeded a reasonably prompt timeframe;

f.  Plaintiff was not given timely and equal access to information used during the informal and formal disciplinary meetings, including but not limited to, the hearing packet of documents during the Complainant Conference.

218.  Defendants additionally violated VAWA when they chose not to provide Plaintiff with Assaulter Roe's corrections to his transcript and his response to Plaintiff's transcript.

219.    Indeed, VAWA requires the parties to a Title IX proceeding be given "timely and equal access to information…used during…formal disciplinary meetings and hearings."

220.    Moreover, the OCR September 2017 "Q&A on Campus Sexual Misconduct" requires that "decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings."

221.    It is clear through Defendants' actions that while Assaulter Roe was allowed free and open access to all necessary materials, the same opportunity was not similarly extended to Plaintiff.

222.    Quite the opposite, Plaintiff was openly denied access to the necessary materials leading to an inherently and inescapably unfair disciplinary process.

**Plaintiff is Left in Shambles**

223.    As a result of the Assault, Plaintiff suffered tremendous emotional trauma. Plaintiff found herself forever altered.

224.    Plaintiff fell into a depression and had lived in fear during her entire freshman year of running into Assaulter Roe on campus.

225.    As a result of the trauma she suffered and the debilitating fear she faced while enrolled at Defendant Union, Plaintiff was unable to perform at the same academic level as she had previously.

226.    Plaintiff, after speaking with Defendant Kelley immediately after the Assault, did not hear from the Title IX Office again until December of 2017.

227.    As a direct and foreseeable result of the Assault and Defendant Union's refusal to offer Plaintiff any meaningful support, Plaintiff was made to feel ashamed of what had happened

to her and she felt absolutely helpless at seemingly every step. Defendant Union had failed to put Plaintiff's needs first in favor of making things easier for her rapist.

228.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered significant emotional injuries. Plaintiff has been traumatized, deprived of happiness and a feeling of security, and suffers daily from feelings of hopelessness and the inability to move on in her life from this tragic event.

229.   Plaintiff has been and continues to be, treated by a mental health professional.

## CAUSES OF ACTION
## AS AND FOR A FIRST CAUSE OF ACTION
*(Discrimination in violation of Title IX: Hostile Education Environment –*
*Sexually Hostile Culture)*

230.   Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

231.   As set forth in detail above, Defendants actively created and/or condoned and/or were deliberately indifferent to a culture of sexual hostility and violence against women by instituting policies and permitting practices that included, but were not limited to: (i) purposefully ignoring and/or condoning a social culture of sexual violence and harassment perpetrated by its all-male fraternities; (ii) intentionally ignoring and/or delaying investigation(s) of complaints of sexual misconduct and rape perpetrated against its female students; (iii) failing to fulfill their obligations as mandatory reporters following receipt of complaints of sexual misconduct and/or sexual assault; (iv) failing to objectively and sufficiently investigate complaints of sexual misconduct and/or sexual assault; (v) intentionally misrepresenting evidence gathered during investigations into complaints of sexual misconduct and/or sexual assault; (vi) failing to proffer equal opportunities to female complainants during the investigation and/or adjudication of complaints of sexual misconduct and/or sexual assault; (vii) failing to

timely hold evidentiary and/or disciplinary hearings to the detriment of female complainants; and (vii) providing male students accused of sexual misconduct and/or sexual assault unwarranted leniency in the adjudication of Title IX complaints brought by female students.

232.    Defendants' sexually hostile policies and practices were a proximate cause of Plaintiff's subjection to months of sexual harassment in the form of (i) sexual assault by one of Defendant Union's upperclassmen; (ii) a hostile educational environment; and (iii) ongoing and prolonged harassment by forcing Plaintiff to interact with her assailant in her daily academic life.

233.    The sexual harassment that Plaintiff suffered was so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits from Defendant Union.

234.    As a direct and proximate result of Defendants' creation of and deliberate indifference to its sexually hostile educational environment, Plaintiff suffered damages and injuries for which Defendants are liable.

### AS AND FOR A SECOND CAUSE OF ACTION
*(Gender Discrimination in violation of Title IX: Deliberate Indifference to Plaintiff's Rape)*

235.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

236.    Title IX prohibits federally-funded institutions such as Defendant Union from engaging in discrimination on the basis of sex.

237.    Sexual harassment is included within the meaning of "discrimination" under Title IX.

238.    Sexual harassment of a student creates a hostile environment if the conduct is sufficiently severe that it denies or limits a student's ability to participate in or benefit from educational programs.

239.   A single instance of rape is sufficiently severe to create a hostile education environment.

240.   Title IX requires universities to promptly investigate student complaints of sexual harassment, and to take interim measures to ensure that its students are not subjected to a hostile education environment. The failure to do so amounts to "deliberate indifference" for which Defendants may be held liable under Title IX.

241.   Defendants were on notice and aware of Plaintiff's rape as well as the identity of Assaulter Roe as early as September of 2017.

242.   Defendants deliberately chose not to investigate Assaulter Roe after learning about Plaintiff's rape in September of 2017 and deliberately prolonged the investigative process after receiving Plaintiff's second complaint in January of 22018 to Plaintiff's direct detriment.

243.   Defendants' failure to promptly investigate the Assault, conduct a timely and unbiased investigation and hearing or find Assaulter Roe responsible for the Assault was intentional and unreasonable.

244.   Defendants' actions, and/or lack thereof, constitute "deliberate indifference" in violation of Title IX.

245.   As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's rape and Defendants' violations of Title IX, Plaintiff was exposed to continued harassment by Assaulter Roe which sexual harassment was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff equal access to meaningful educational opportunities and benefits including, but not limited to, academics, on-campus events and activities, and extracurricular activities.

246.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's rape and Defendants' violations of Title IX, Plaintiff was subjected to a hostile education environment while attempting to pursue her education on Defendant Union's campus.

247.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's rape and Defendants' violations of Title IX, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

248.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's rape and Defendants' violations of Title IX, Plaintiff suffered damages and injuries for which Defendants are liable.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Negligence)*

249.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

250.    Defendants owed a duty of reasonable care to protect Plaintiff from a sexually hostile environment which Defendants fostered and that was foreseeable.

251.    Defendants knew, or should have known, of the serious risk of sexual harassment and assault that was occurring on Defendant Union's campus, and knew or should have known of the risk of sexual violence toward their female students.

252.    The aforementioned sexually hostile policies of Defendants made the likelihood of sexual violence toward Defendant Union's female students foreseeable.

253.    Defendants further had a duty of care and loyalty to institute its practices and procedures, including but not limited to the Policy and the Administrative Policy, in a fair, equitable, reasonable, and unbiased manner.

254.    Defendants breached their duty to Plaintiff through its aforementioned sexually discriminatory policies, practices, and actions, without any regard for the safety of women like Plaintiff at Defendant Union. Defendants further breached their duty to Plaintiff by way of failing to properly investigate and adjudicate Plaintiff's Title IX Complaint in compliance with the Policy and/or the Administrative Policy.

255.    As a direct and proximate result of Defendants' breach(es), Plaintiff suffered damages and injuries for which Defendants are liable under New York State Common Law.

### AS AND FOR A FOURTH CAUSE OF ACTION
*(Intentional and/or Negligent Infliction of Emotional Distress)*

256.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

257.    At all times relevant herein, Defendants knew or should have known of their duty to protect Plaintiff from a sexually hostile environment.

258.    Further, at all times relevant herein, Defendants knew or should have known of their obligation to promptly and fully investigate and adjudicate all complaints of sexual misconduct under both federal and state law.

259.    Defendants intentionally failed to meet their obligations to promptly and fully investigate and adjudicate all complaints of sexual misconduct under both federal and state law when they, among other things, intentionally delayed the investigation and adjudication of Plaintiff's Title IX Complaint, failed to properly investigate Plaintiff's Title IX Complaint and thereafter administered biased evidentiary hearings favoring Plaintiff's male attacker, and failed to properly discipline Assaulter Roe allowing him to escape liability.

260.    As a direct and foreseeable consequence of Defendants' actions and/or inactions, Plaintiff sustained tremendous damages, including, without limitation, severe emotional distress,

loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

261.   The emotional distress was severe enough that it has resulted in illness and/or mental harm to Plaintiff.

262.   Defendants' extreme and outrageous conduct was the cause of Plaintiff's distress.

263.   Considering the gravity and seriousness of Defendants' actions and/or inactions, Defendants should have recognized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm to Plaintiff.

264.   Plaintiff's distress is reasonable in light of Defendants' conduct.

265.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
*(Breach of Implied and/or Express Contract)*

266.   Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

267.   Based on the aforementioned facts and circumstances, Defendants created to express and implied contracts when Plaintiff was accepted as a student at the College.

268.   Plaintiff at all times was expected to adhere to Defendant Union's internal policies and procedures, and at all times did so adhere to such policies and procedures.

269.   In contrast, Defendants were required to adhere to and implement the College's policies and procedures, including but not limited to the Policy and the Administrative Policy.

270.    During the Title IX process, Defendants intentionally and repeatedly failed to abide by the Policy and/or the Administrative Policy to the direct detriment of Plaintiff, thus causing Plaintiff significant damages.

271.    Based on the foregoing facts and circumstances, Defendants breached their express and/or implied agreement(s) with Plaintiff and are liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## DEMAND FOR A JURY TRIAL

272.    Pursuant to FRCP 38(b), Plaintiff hereby demands a trial by jury on all claims.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff seeks a judgment against Defendants as follows:

(i)     An Order enjoining Defendants, along with their agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent and/or remedy sexual harassment;

(ii)    Injunctive relief required Defendant Union to redress its violations of Title IX, including: (1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment policy; (2) distributing written policies to all students describing prohibited activities and conduct and the consequences for violations; and (3) providing for annual, independent review by outside reviewers of Defendants' compliance with sexual harassment policies and Title IX guidance;

(iii)    An award of damages against Defendants on Plaintiff's claims one through five, as outlined above, including, without limitation, reimbursement of and prepayment for all of Plaintiff's tuition or related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damages for deprivations of the equal access to the education benefits and opportunities provided by Defendants; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future earnings and enjoyment of life in an amount to be determined at trial;

(iv)    Punitive and/or exemplary damages against Defendants;

(v)    Statutory pre- and post-judgment interest on all sums awarded;

(vi)    An award of costs and attorneys' fees; and

(vii)    Any other relief the Court finds just and proper.

**Dated: New York, New York**
**February 28, 2019**

**NESENOFF & MILTENBERG, LLP**
**Attorneys for Plaintiff**

**By:**     **/s/ Andrew Miltenberg**
**Andrew T. Miltenberg, Esq.**
**Gabrielle M. Vinci, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**