UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JANE DOE,

                    Plaintiff,                    **Civil Case No. 1:19-CV-284 GLS/CFH**

     -against-

UNION COLLEGE, THE BOARD OF TRUSTEES
OF UNION COLLEGE, MELISSA A. KELLEY,
Individually and as an agent for Union College,
TRISH WILLIAMS, individually and as an agent
for Union College; DARCY A. CZAJKA, individually
and as an agent for Union College,

                    Defendants.

# MEMORANDUM OF LAW

CARTER, CONBOY, CASE, BLACKMORE,
MALONEY & LAIRD, P.C.
Attorneys for Defendants
Office and P.O. Address
20 Corporate Woods Boulevard
Albany, NY 12211-2396
Phone: (518) 465-3484

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 2

a. Union's Published Sexual Misconduct Policy and Formal Resolution Procedure ..... 2

b. Union's Investigation of the Sexual Misconduct Complaint by Jane Doe ..... 6

ARGUMENT ..... 9

I. PLAINTIFFS' FIRST AND SECOND CAUSES OF ACTION ALLEGING VIOLATIONS OF TITLE IX MUST BE DISMISSED AS THEY FAIL TO STATE CAUSES OF ACTION ..... 10

a. Plaintiff's first cause of action against Union for violation of Title IX due to a "hostile education environment" fails to state a cause of action ..... 11

b. Plaintiff's second cause of action alleging that the defendants were deliberately indifferent to plaintiff's complaint of sexual misconduct in violation of Title IX fails to state a cause of action ..... 16

II. PLAINTIFF'S FIRST AND SECOND CAUSES OF ACTION BROUGHT UNDER TITLE IX MAY BE BROUGHT ONLY AGAINST INSTITUTIONAL DEFENDANTS ..... 20

III. PLAINTIFFS THIRD CAUSE OF ACTION FOR NEGLIGENCE MUST BE DISMISSED AS IT FAILS TO STATE A CAUSE OF ACTION ..... 21

IV. PLAINTIFFS FOURTH CAUSE OF ACTION FOR INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS MUST BE DISMISSED AS IT FAILS TO STATE A CAUSE OF ACTION ..... 22

a. Plaintiff's cause of action for intentional infliction of emotional distress fails to state a cause of action ..... 22

  b. Plaintiff's cause of action for negligent infliction of emotional distress
   fails to state a cause of action.................................................................. 24

V. PLAINTIFF'S FIFTH CAUSE OF ACTION FOR BREACH OF
 CONTRACT MUST BE DISMISSED AS IT FAILS TO STATE A CAUSE
 OF ACTION................................................................................................... 26

VI. PLAINTIFF DOES NOT HAVE A PRIVATE RIGHT OF ACTION
 UNDER THE VIOLENCE AGAINST WOMEN ACT ..................................... 32

CONCLUSION.................................................................................................... 33

## TABLE of AUTHORITIES

**Page**

### Cases Cited

Alexander v. Sandoval, 532 U.S. 275 (2001)........................................................12

Ashcroft v. Iqbal, 556 U.S. 662 (2009)..............................................................10

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ...............................................10

Bliss v. Putnam Valley Cent. Sch. Dist., 2011 U.S. Dist. LEXIS 35485 (S.D.N.Y. 2011)...11

Cavallaro v. Pozzi, 28 A.D.3d 1075 (4th Dep't 2006) .........................................23

Chandrapaul v. City Univ. of N.Y., 2016 U.S. Dist. LEXIS 52961 (E.D.N.Y 2016)............21

Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382 (N.Y. 1987) ...........22

Clesi v. Zinc Corp. of Am., 2011 U.S. Dist. LEXIS 16441, (N.D.N.Y. 2001)........................33

Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629 (1999)..........................................11, 16

DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104 (2d Cir. 2010).............................................3

Doe v. Brown University, 166 F.Supp.3d 177 (D.R.I. 2016)................................................16

Doe v. Colgate Univ., 2017 U.S. Dist. LEXIS 180267 (N.D.N.Y. 2017) ...........................11

Doe v. Coll. of Wooster, 243 F.Supp.3d 875 (N.D. Ohio 2017) .........................................24

Doe v. Rider Univ., 2018 U.S. Dist. LEXIS 7592 (D.N.J. 2018) .........................................24

Esposito v. New York, 453 F. App'x. 37 (2d Cir. 2011).......................................................33

Faiaz v. Colgate Univ., 64 F.Supp.3d 336 (N.D.N.Y. 2014)..............................................22

Fellheimer v. Middlebury Coll., 869 F. Supp. 238 (D. Vt. 1994).........................................24

Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246 (2009) ........................................20, 21

Fraad-Wolff v. Vassar College, 932 F. Supp. 88 (S.D.N.Y. 1996) .....................................24

Gally v. Columbia Univ., 22 F.Supp.2d 199 (S.D.N.Y. 1998)............................................27

Gay v. Carlson, 60 F.3d 83 (2d Cir. 1995)........................................................................23

Heckman v. Town of Hempstead, 568 F. App'x 41 (2d Cir. 2014).........................................3

Howell v. New York Post Co., 81 N.Y.2d 115 (N.Y. 1993)...................................................23

Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638 (2d Cir. 1998)......................................10

Johnson v. New York City Bd. of Educ.,704 N.Y.S.2d 281 (2d Dep't 2000) ......................25

Keating v. Town of Burke, 86 A.D.3d 660 (3d Dep't 2011) .................................................21

Leeds v. Meltz, 85 F.3d 51 (2d Cir. 1996)...........................................................................10

Leff v. Our Lady of Mercy Academy, 150 A.D.3d 1239 (2d Dep't 2017) .............................23

Mallory v. Ohio University, 76 F. App'x 634 (6th Cir. 2003) .................................................16

Mangiafico v. Blumenthal, 471 F.3d 391 (2d Cir. 2006).......................................................3

Martin v. Citibank, N.A., 762 F.2d 212 (2d Cir. 1985) ........................................................23

Mortise v. United States, 102 F.3d 693 (2d Cir. 1996)...................................................24, 25

Murphy American Home Prod. Corp., 58 N.Y.2d 293 (N.Y. 1983).......................................23

New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308 (N.Y. 1995)...........................................22

Papelino v. Albany College of Pharm. of Union Univ., 633 F.3d 81 (2d Cir. 2011)............26

Pasquaretto v. Long Island Univ., 106 A.D.3d 794 (2d Dep't 2013) ..................................22

Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123 (2d Cir. 2001) ....................9

Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256 (1979)................................................13

Prasad v. Cornell Univ., 2016 U.S. Dist. LEXIS 161297 (N.D.N.Y. 2016) ..........................22

Ricci v. DeStefano, 557 U.S. 557 (2009)............................................................................12

Ross v. Corp. of Mercer Univ., 506 F.Supp.2d 1325 (M.D. Ga. 2007) ...............................20

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ..................................................................3

Routh v. University of Rochester, 981 F.Supp.2d 184 (W.D.N.Y. 2013)........................27, 29

Saravanan v. Drexel Univ., 2017 U.S. Dist. LEXIS 193925 (E.D.P.A. 2017).....................16

Simpson v. Uniondale Union Free Sch. Dist., 702 F.Supp.2d 122 (E.D.N.Y. 2010) .......... 25

Talbot v. N.Y. Inst. of Tech, 225 A.D.2d 611 (2d Dep't 1996) ............................................ 22

Tolbert v. Queens Coll., 242 F.3d 58 (2d Cir. 2001) ......................................................... 12

Tubbs v. Stony Brook Univ., 2016 U.S. Dist. LEXIS 28465 (S.D.N.Y 2016) ............ 3, 16, 19

United States v. Morrison, 529 U.S. 598 (2000) ............................................................... 33

United States ex rel. Ben-Shlush v. St. Luke's-Roosevelt Hosp., 2000 U.S. Dist.
LEXIS 3039 (S.D.N.Y. 2000) ........................................................................................... 24

Vought v. Teachers College, Columbia University, 127 A.D.2d 654 (2d Dep't 1987) ........ 22

Walker v. New York, 974 F.2d 293 (2d Cir. 1992) ............................................................. 10

Walker v. President and Fellows of Harvard Coll., 82 F.Supp.3d 524 (D. Mass. 2014) ..... 11

Ward v. New York Univ., 2000 U.S. Dist. LEXIS 14067 (S.D.N.Y. 2000) .......................... 27

Weser v. Glen, 190 F. Supp. 2d 384 (E.D.N.Y. 2002) ...................................................... 14

Wolff v. State Univ. of N.Y. College at Cortland, 2016 U.S. Dist. LEXIS (N.D.N.Y. 2016) . 20

Yu v. Vassar Coll., 97 F. Supp. 3d 448 (S.D.N.Y. 2015) .............................................. 11, 12

Yusuf v. Vassar Coll., 35 F.3d 709 (2d Cir. 1994) .................................................. 12,13,14

## **Statutes**

20 U.S.C. §1681(a) ...................................................................................................... 10, 12

## **PRELIMINARY STATEMENT**

Plaintiff commenced this action seeking damages as a result of defendants' alleged violations of Title IX and New York state common law.  Specifically, plaintiff's First Amended Complaint asserts five causes of action: (1) discrimination in violation of Title IX: sexually hostile culture; (2) gender discrimination in violation of Title IX: deliberate indifference; (3) common law negligence; (4) common law intentional and/or negligent infliction of emotional distress; and (5) breach of contract.

Plaintiff made a complaint of sexual misconduct against a fellow student at Union College.  An investigation was conducted by neutral investigators pursuant to Union College's written policies and procedures.  A hearing was held before an Adjudication Panel which reached findings and conclusions.  Those findings and conclusions were affirmed by an Appeals Panel.  Despite Union College's adherence to its written policies and procedures, plaintiff now asks this Court to substitute her judgment for that of Union College's Adjudication Panel in this internal disciplinary matter, based upon speculative and conclusory claims of wrongdoing by Union College.

Sexual misconduct and harassment against students by other members of the Union College community threatens Union's educational goals.  Allegations of sexual misconduct are subject to careful review.   Union's policies and procedures for investigating and adjudicating allegations of sexual misconduct are based on Union's commitment to promoting a safe, respectful, welcoming, and inclusive educational environment for all members of the Union community.  *See*, Affidavit of Michael J. Murphy, Esq. (hereinafter "Murphy Aff."), Ex. A, p. 6.  Union's decisions with regard to discipline related to complaints of sexual misconduct are educational in nature.  Such decisions

should be given deference by the Court, as they are based upon Union's internal policies and procedures, and there are no plausible allegations of discrimination or bad faith alleged in the First Amended Complaint. Union's policies and procedures for promptly and equitably resolving allegations of sexual misconduct balance the interests of individual Union students, along with those of Union's entire student body and its educational mission. Union's determination, relative to a complaint of sexual misconduct, based upon its published Sexual Misconduct Policy, is an exercise of professional educational judgment.

Defendants, Union College, the Board of Trustees of Union College, Melissa Kelley, Trish Williams and Darcy Czajka (hereinafter "defendants"), respectfully submit this motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), seeking dismissal of plaintiff's First Amended Complaint, with prejudice and on the merits, based on failure to state a claim upon which relief can be granted, together with such other and further relief the Court may deem just and proper.

## STATEMENT OF FACTS

### a.    Union's Published Sexual Misconduct Policy and Formal Resolution Procedure

At all times relevant to this action, Union had written and published policies and procedures in place to ensure the prompt and equitable resolution of complaints involving sexual misconduct. These policies, set forth in Union's Sexual Misconduct Policy (hereinafter "Policy"),[1] were enacted "to reflect and maintain [Union's] institutional values

---

[1] In addition to the Sexual Misconduct Policy, the complaint also refers to both an "Administrative Policy" (compl. ¶ 91) and a "Sexual Misconduct Bill of Rights" (compl. ¶ 203). Both of these policies are contained within the Sexual Misconduct Policy provided by the defendants. *See*, Murphy Aff., Ex. A, pp. 6–8 and 42–43, respectively.

and community expectations, to provide for fair and equitable procedures for determining when this Policy has been violated, and to provide recourse for individuals and the community in response to violations of this Policy." Murphy Aff., Ex. A, p. 5.[2] Complaints of sexual misconduct against Union students are handled in accordance with this Policy's detailed procedure. *See*, Murphy Aff., Ex. A, Appendix A.

The Policy enumerates nine specific examples of impermissible sex or gender-based harassment, providing students and members of the Union College community with notice that any kind of sexual harassment, including the enumerated categories, is not tolerated and may result in disciplinary action. Id. at p. 13. The Policy states that "Formal Resolution of a complaint under this policy will occur through the use of an Adjudication Panel." Id. at p. 39. The Policy sets forth the following procedure for formal resolution of a complaint:

1. Initiating the Disciplinary Process
2. Responding to a Disciplinary Complaint
3. Fact Finding Investigation
4. Investigative Report
5. Document Review
6. Notice of Charges
7. Notice of Adjudication

---

[2] The Union College Sexual Misconduct Policy is properly considered in connection with the defendants' motion to dismiss. "[T]he Court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon it." Tubbs v. Stony Brook Univ., 2016 U.S. Dist. LEXIS 28465, at *11 (S.D.N.Y. 2016) (quoting Heckman v. Town of Hempstead, 568 F. App'x 41, 43 (2d Cir. 2014)). Moreover, a document may be incorporated when a plaintiff had possession or knowledge of the document, upon which they relied in drafting the complaint. Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (holding that the complaint is deemed to include "documents plaintiffs either possessed or knew about and upon which they relied in bringing the suit"). A court may additionally consider a document not incorporated by reference into the complaint "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). Here, plaintiff alleges that she was provided the Sexual Misconduct Policy (compl. ¶ 112), and plaintiff quotes and refers heavily from the Sexual Misconduct Policy. Therefore, the Court can properly consider the Policy in connection with the defendants' motion. *See, e.g.*, compl. ¶¶ 91–92, 113, 116, 148, 150, 151, 168, 165, 176, 183, 196, 222, 265, 280.

8. Panel Adjudication/Decision
9. Sanctions
10. Outcome Letter
11. Appeals
12. Concerns about the Implementation of this Policy
13. Integrity of Process
14. Conclusion of Case.  Id.

The Policy notes that the disciplinary process is commenced following Union's receipt of a statement from the complainant detailing the allegations of sexual misconduct.  Murphy Aff., Ex. A, p. 32, 40.  The Policy states that "[t]he Complainant's Statement is one of the most important documents to be considered in the Sexual Misconduct Adjudication Process."  Id. at p. 41.  Once a complaint has been submitted, a "No Contact Order" is put into place between the complainant and the respondent to bar any communication or contact between the parties.  Id. at p. 42.  The respondent is advised in writing of the disciplinary complaint against him or her.  Id. at p. 43.  If the claim is disputed, the respondent is required to meet with the Title IX Team within five days and provide a written response to the Title IX Coordinator.  Id. at pp. 45–46.

Once statements of both complainant and respondent are submitted to the Title IX Coordinator, neutral investigators are appointed by Union to conduct a fact finding investigation.  Id. at p. 45.  In completing the investigation, the investigators may conduct document review, party interviews, witness interviews, and/or consult expert witnesses. Id. at pp. 47–48.  Once the investigation is complete, the investigators prepare a report summarizing the relevant facts received through the investigation, which is presented to the Senior Associate Dean of Students and Director of Student Conduct and the Title IX Coordinator for review, along with any witness statements and documentary evidence.

Id. at pp. 48–49.   Irrelevant, immaterial, prejudicial, and otherwise inadmissible information is redacted from the report by the Senior Associate Dean of Students.  Id.

The finalized report is made available to both parties for review at the Dean of Students' office or in the Title IX Coordinator's office.  Id. at p. 50.  Under the Policy, no documents are permitted to be taken from the office by either party.  Id.  After reviewing the final investigative report, either party can submit proposed changes or concerns.  Id.

Following finalization of the report, a letter is sent to both the complainant and the respondent providing a brief summary of the conduct at issue and the specific provisions of the policy that are alleged to have been violated.  Id. at p. 51.  Specific information about each party's meeting with the "Adjudication Panel", called a "pre-decision conference" is also contained therein.  Id.  The "Adjudication Panel" (hereinafter "Panel") is appointed by the Title IX Coordinator, and is "typically composed of two (2) faculty or staff members, two (2) students, and a Senior Student Affairs Administrator."  Id. at p. 52. The purpose of the pre-decision conference is for both the complainant and respondent to comment on and respond to the information presented, ask and answer questions, and provide any additional information that should be considered prior to a final decision being rendered.  Id. at p. 52.

Following both conferences, the complainant and respondent are afforded the opportunity to review the entire written transcript of both conferences.  Id.  The parties are then able to submit additional information, statements, and/or corrections to the Panel for it to consider in its deliberations.  Id.  After the complainant and respondent have met with the Panel, the panel members deliberate in a closed meeting.  Id. at p. 55.  The Panel then determines, by a preponderance of the evidence, whether it is more likely than not

that a respondent is responsible for the alleged violation(s).  Id.  The parties are notified of the Panel's decision "at or near the same time."  Id. at p. 58.

The Policy states as follows:

> The Panel Adjudication process is intended to provide a fair and ample opportunity for each side to represent his/her account of the incident and for the Panel to determine whether College policy was violated and to recommend appropriate sanctions, if necessary.  The Panel is a formal proceeding not comparable to a criminal or civil process; it is the mechanism by which the college assesses, and as appropriate, takes formal disciplinary action regarding a violation of College Policy.  Id. at p. 53.

Either party may appeal the Panel's determination on one of the following grounds: (1) procedural error; (2) new information; and/or (3) severity of the disciplinary action.  Id. at pp. 58–60.  Appeals are heard by an "Appeals Panel," which is a three-person impartial panel comprised of a senior administrator and two trained panel members who were not part of the original decision making process.  Id. at p. 59.  A written decision is rendered within approximately 15 days following the filing of a notice of appeal.  Id. at p. 60.  The outcome of the appeal is put in a written decision and mailed to each party.  Id.

### b.   Union's Investigation of the Sexual Misconduct Complaint by Jane Doe[3]

Plaintiff's First Amended Complaint alleges that she attended an orientation session held by Dr. Melissa Kelley, Union's Tile IX Coordinator, on September 4, 2017.  Compl. ¶ 74.  Plaintiff informed Dr. Kelley of her allegations of sexual misconduct against another Union student shortly after.  Id. at ¶¶ 75–76.  Upon hearing plaintiff's allegations,

---

[3] The facts recited herein are drawn from the complaint as well as pertinent Union policies and procedures that are incorporated by reference in the complaint.  *See,* Murphy Aff., Ex. A.  The complaint's factual allegations are accepted as true solely for purposes of this motion.

Dr. Kelley directed plaintiff to go to Union's health center. Id. at ¶ 81. Plaintiff claims that Dr. Kelley did not follow up with plaintiff after this conversation. ¶¶ 81–82.

Plaintiff, accompanied by her mother, met with Dr. Kelley, the Director of Campus Safety, and the Senior Associate Dean of Students and Director of Student Conduct, Trish Williams, on January 16, 2018. Compl. ¶ 110. At this meeting, plaintiff was counseled about filing a complaint based upon her allegations, and about the potential avenues for relief available to plaintiff. Id. at ¶ 110–111.[4] Union issued a No Contact Order to the respondent on January 18, 2018, two days after meeting with plaintiff. Compl. ¶ 114; Murphy Aff., Ex. A, pp. 35–36, 42. The disciplinary process was commenced on January 22, 2018 once the plaintiff submitted her written statement detailing the allegations of sexual misconduct. Compl. ¶ 115; Murphy Aff., Ex. A, pp. 39–41.

The respondent was notified of the complaint and provided with an opportunity to review the complaint. Compl. ¶ 116. Respondent then submitted his own written statement in response to the complaint. Compl.; Murphy Aff., Ex. A, pp. 44–46. Neutral investigators were appointed to complete an investigation into plaintiff's complaint. The precise order of and manner in which the neutral investigators investigate complaints is not set forth in the Policy, and is a matter of independent discretion of the assigned investigators. *See generally*, Compl. ¶¶ 117–131; Murphy Aff., Ex. A, pp. 46–48. The Policy sets forth that investigators *may* undertake the following to complete their investigation: conduct document review, party interviews, witness interviews, and/or consult expert witnesses. Murphy Aff., Ex. A, pp. 47–48 (emphasis supplied).

---

[4] Plaintiff was aware of Union's Sexual Misconduct Policy, and was able view it on Union College's website. *See, e.g.*, Compl. ¶¶ 91–92, 112–113.

The investigators prepared an investigation report once their investigation was completed.  Compl. ¶ 132; Murphy Aff. Ex. A, p. 49.  The Senior Associate Dean of Students and Director of Student Conduct, Ms. Williams, and Dr. Kelley then reviewed the investigative report and its accompanying evidence, and redacted any immaterial, prejudicial, or otherwise inadmissible information.  Murphy Aff., Ex. A, pp. 49–50.  The report was then made available for both the complainant and respondent to review. Compl. ¶ 141; Murphy Aff., Ex. A, p. 50.  They were each provided the opportunity under the Policy, which plaintiff took, to submit requested changes to the report.  Compl. ¶¶ 145–147; Murphy Aff., Ex. A, p. 50.  Neither party was permitted to take either the report, or any materials contained therewith, under the Policy.  Murphy Aff., Ex. A, p. 50.

Once the report was finalized, both parties were sent a letter identifying the specific provisions of the Policy respondent was alleged to have violated, and were notified of their respective pre-decision conferences before the Adjudication Panel.  Compl. ¶ 148; Murphy Aff., Ex. A, p. 51.  The appointed Adjudication Panel consisted of the Associate Dean of Students, two faculty members, the Director of Residential Life, and a Union student.  Compl. ¶ 152.  Separate pre-decision conferences were held for plaintiff and respondent.  Compl. ¶¶ 149, 161.  Plaintiff submitted questions which were asked of the respondent at his pre-decision conference.  Id. at ¶ 168.

Both parties were provided with transcripts of the pre-decision conferences. Compl. ¶ 183; Murphy Aff., Ex. A, pp. 52–53.  Plaintiff was provided under the Policy, and took advantage of, the opportunity to submit additional information, statements, and/or corrections following her receipt of both transcripts.  Compl. ¶¶ 183–184; Murphy Aff., Ex.

A, pp. 52–53. This included a rebuttal of the respondent's statements given at his conference and twelve pages of corrections to the transcripts. Compl. ¶ 184.

Following receipt of all evidence, the Panel then conducted deliberations based on all available evidence. Murphy Aff., Ex. A, p. 55. On May 22, 2018, plaintiff and her advisor were informed that the Panel did not find the respondent responsible for the conduct alleged in the complaint. Compl. ¶¶ 189–191. Respondent was also informed of this decision. Compl. ¶ 190. As required under Union's Policy, the notification of both the complainant and respondent occurred "at or near the same time." Compl. ¶ 190; Murphy Aff., Ex. A, p. 58.

Plaintiff appealed the Adjudication Panel's findings. Compl. ¶ 206. Respondent was notified of plaintiff's appeal and submitted a response to same. Murphy Aff., Ex. A, p. 59. An Appeal Panel was appointed. In this case, Darcy Czajka, Union Chief of Staff, served as the Chair of the Appeals Panel. Compl. ¶ 213. Ms. Czajka informed plaintiff of the denial of plaintiff's appeal by a written decision setting forth the precise basis for the denial. Compl. ¶¶ 214–224.

Plaintiff commenced this action by filing of the Summons and Complaint on March 1, 2019. (Dkt. 1). The defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on April 1, 2019. (Dkt. 13). Plaintiff filed a First Amended Complaint on April 22, 2019. (Dkt. 19). The defendants now move to dismiss the First Amended Complaint.

## ARGUMENT

In evaluating Rule 12(b)(6) motions to dismiss for failure to state a claim, "the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." Patel v. Contemporary Classics of Beverly Hills, 259

F.3d 123, 126 (2d Cir. 2001) (*citing* Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998)).  Dismissal is appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Walker v. New York, 974 F.2d 293, 298 (2d Cir. 1992) (internal quotations and citation omitted).  "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice."  Leeds v. Meltz, 85 F. 3d 51, 53 (2d Cir. 1996).

The Supreme Court clarified that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Ashcroft v. Iqbal, 556 U.S. 662, 679–80 (2009) (*quoting*, Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, also are insufficient."  Id.  Thus, a pleading that offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" is insufficient.  Id. (*quoting,* Twombly, 550 U.S. at 555).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] that the pleader is entitled to relief."  Id. at 679 (internal citations and quotations omitted).

## POINT I

### PLAINTIFF'S FIRST AND SECOND CAUSES OF ACTION ALLEGING VIOLATIONS OF TITLE IX MUST BE DISMISSED AS THEY FAIL TO STATE CAUSES OF ACTION

Title IX of the Education Amendments of 1972 prohibits sexual discrimination by federally funded educational institutions.  *See*, 20 U.S.C. § 1681(a). An educational institution's failure to prevent or remedy sexual harassment of a student, including sexual

assault, may violate Title IX.  *See*, Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 648 (1999); Bliss v. Putnam Valley Cent. Sch. Dist., 2011 U.S. Dist. LEXIS 35485, *13 (S.D.N.Y. 2011).

The Supreme Court set forth the "limited circumstances" in which a recipient of federal funding can be liable for discrimination arising out of student-on-student harassment in Davis v. Monroe County Board of Education.  526 U.S. 629, 644–45 (1999).  Davis sets forth three elements that are needed for a plaintiff to demonstrate a prima facie case of student-on-student sexual harassment: (1) the alleged harassment was so "severe, pervasive, and objectively offensive" that it deprived the plaintiff of "access to the education opportunities or benefits provided by the school"; (2) the funding recipient had "actual knowledge" of the sexual harassment and (3) the funding recipient was "deliberately indifferent to the harassment."  Id. at 642–43.

In evaluating Title IX claims, "[t]he Court cannot engage in a granular examination of the record to find fault in the Panel's decision-making."  Doe v. Colgate Univ., 2017 U.S. Dist. LEXIS 180267 (N.D.N.Y. 2017).  *See also*, Yu v. Vassar Coll., 97 F.Supp.3d 448, 461 (S.D.N.Y. 2015) ("The Court's role . . . is neither to advocate for best practices or policies nor to retry disciplinary proceedings."); Walker v. President and Fellows of Harvard Coll., 82 F.Supp.3d 524, 531–32 (D. Mass. 2014) ("It is not the business of . . . judges to tell universities what statements they may consider and what statements they must reject.")

         **a.**      **Plaintiff's first cause of action against Union for violation of Title IX due to a "hostile education environment" fails to state a cause of action**

Because "Title IX was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities . . . [and] because Title IX mirrors the substantive provisions of Title VI and the Civil Rights Act of 1964 . . . courts have interpreted Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII." Yusuf v. Vassar Coll., 35 F.3d 709, 714 (2d Cir. 1994). However, while a Title VII claim may be premised on the "disparate impact" a policy has with respect to a protected group (see, e.g., Ricci v. DeStefano, 557 U.S. 557, 577 (2009)), courts have held that disparate-impact claims may not be brought under Titles VI and IX. See, e.g., Alexander v. Sandoval, 532 U.S. 275, 280 (2001) (noting that Title VI "prohibits only intentional discrimination" and that Title IX "was patterned after Title VI"); Yu v. Vassar Coll.. 97 F. Supp. 3d 448 (S.D.N.Y. 2015) (interpreting Sandoval and other precedent to mean there is no private right of action for disparate impact under Title IX and citing cases.)  Thus, in order to establish a claim of discrimination under Title IX, a plaintiff must ultimately show that the defendant discriminated against him or her because of sex; that the discrimination was intentional; and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions.  See, Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001).  It is not enough to show that policy or practice disproportionately affects one sex.

Plaintiff's claim for sex discrimination in violation of Title IX for an alleged "hostile education environment" fails to allege that plaintiff was discriminated against on the basis of her sex.  Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). To raise a cognizable claim of sex discrimination, plaintiff must plausibly allege that "a particular course of action [was undertaken] at least in part because of, not merely in spite

12

of, its adverse effects upon" his sex. Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)(emphasis added)(internal quotation marks omitted).  To survive a motion to dismiss, plaintiff must "specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of . . . discriminatory intent." Yusuf v. Vassar Coll., 35 F.3d 709, 713 (2d Cir. 1994).  "The fatal gap is . . . the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias." Yusuf, 35 F.3d at 715.

Plaintiff's First Amended Complaint does not plausibly allege that any purported errors or omissions in the investigative or adjudicatory process, even if true, are attributable to *intentional* gender bias.  The Second Circuit in Yusuf v. Vassar College (35 F.3d 709, 713 (2d Cir. 1994)) set forth examples of allegations sufficient to state a Title IX claim in this context.  "Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Id.  Plaintiff in this case does not make any such allegations.  Indeed, completely absent from the First Amended Complaint are any allegations that any Union employee or representative said or implied anything at all in reference to plaintiff's sex.

Instead, plaintiff makes conclusory allegations that Union engaged in a pattern of policies and decision-making that had the effect of discriminating against women. Specifically, plaintiff alleges that Union was "deliberately indifferent to a culture of sexual hostility and violence against women by instituting policies and permitting practices" that:

> (i) purposefully ignoring and/or condoning a social culture of sexual violence and harassment perpetrated by its all-male fraternities; (ii) intentionally ignoring and/or delaying investigation(s) of complaints of sexual misconduct and rape perpetrated against its female students; (iii) failing to fulfill their

obligations as mandatory reporters following receipt of complaints of sexual misconduct and/or sexual assault; (iv) failing to objectively and sufficiently investigate complaints of sexual misconduct and/or sexual assault; (v) intentionally misrepresenting evidence gathered during investigations into complaints of sexual misconduct and/or sexual assault; (vi) failing to proffer equal opportunities to female complainants during the investigation and/or adjudication of complaints of sexual misconduct and/or sexual assault; (vii) failing to timely hold evidentiary and/or disciplinary hearings to the detriment of female complainants; and [(viii)] providing male students accused of sexual misconduct and/or sexual assault unwarranted leniency in the adjudication of Title IX complaints brought by female students. Compl. ¶ 242.

These conclusory and speculative allegations, even if taken as true, sound in disparate impact, for which there is no private cause of action under Title IX, and not disparate treatment, which is required in this case. *See*, Weser v. Glen, 190 F.Supp.2d 384, 395 (E.D.N.Y. 2002) *aff'd*, 41 F. App'x 521 (2d Cir. 2002). Plaintiff makes broad claims which fail to identify any specific instances of Union allegedly discriminating against plaintiff based upon her sex in resolving her complaint. Moreover, plaintiff alleges speculative and conclusory claims relative to Union's handling of other complaints of sexual misconduct. Compl. ¶¶ 104–106. These claims, asserted "[b]y way of example only" and "upon information and belief," fail to allege intentional discrimination by Union against plaintiff because of her sex. *See*, Compl. ¶ 105. As plaintiff's non-conclusory factual allegations fail to give rise to a plausible inference that the outcome of the investigation and adjudicatory proceeding relative to plaintiff's complaint of sexual misconduct was motivated by sex, plaintiff's Title IX claim must be dismissed.

In addition, plaintiff's allegations fail to plausibly "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." Yusuf, 35 F.3d at 715. First, the vast majority of plaintiff's allegations concern the process of the investigations. Plaintiff raises a series of speculative and conclusory claims about the order, and manner,

in which the investigation into plaintiff's complaint was conducted (discussed in detail, Point V, below).  However, these claims fail to connect how the outcome of the hearing was impacted by any of these alleged procedural errors, particularly in light of the fact that, in addition to the investigative report prepared by Union investigators, both parties also testified before the Panel about their recollection of the subject events, and had the opportunity to submit their own evidence and rebuttals for the Panel to consider.  Compl. ¶¶ 149, 161, 183–185.  As such, plaintiff has failed to causally connect any of her claims of alleged procedural errors in the investigation with the Panel's conclusion, based upon both documentary evidence and testimony, that it was more likely than not that the respondent was not responsible for the conduct alleged in the complaint.  Murphy Aff., Ex. A, p. 55.  Even if taken as true, any alleged procedural error that plaintiff alleges in developing the record with respect to plaintiff's complaint could not be found to have affected the outcome of the hearing.

In any event, even assuming *in arguendo* that plaintiff's First Amended Complaint satisfies the "articulable doubt" prong of the *Yusuf* test, it still fails to state any non-conclusory factual allegations giving rise to a plausible inference that the erroneous outcome was motivated by plaintiff's sex.

In addition, plaintiff's First Amended Complaint alleges that Union, by permitting TD Chi to have a presence on campus, exposed Union's female students to harassment and sexual violence.  Compl. ¶¶ 32–34.  As an initial matter, plaintiff does not allege that the alleged assailant was a member of TD Chi.  Id. at ¶ 45.  Rather, she allege that she merely happened to meet him at the TD Chi fraternity house.  ¶¶ 41, 44.  In any event, plaintiff fails to allege that Union's past discipline of TD Chi, or alleged lack thereof, has

any relationship to Union's handling of plaintiff's claim of sexual misconduct.  Moreover, plaintiff's speculative allegations about Union's handling of TD Chi, a fraternity to which neither party belonged and where none of the subject events took place, has any relationship to Union's alleged creation of a "sexually hostile environment."

Based on the foregoing, plaintiff's first cause of action fails to plausibly allege that Union failed Title IX by discriminating against plaintiff based on her sex.  Therefore, plaintiff's first cause of action must be dismissed.

### b. Plaintiff's second cause of action alleging that the defendants were deliberately indifferent to plaintiff's complaint of sexual misconduct in violation of Title IX fails to state a cause of action

"The deliberate indifference standard set forth in Davis ... set a high bar for plaintiffs to recover under Title IX[.]  [I]t requires only that school administrators respond to known peer harassment in a manner that is not 'clearly unreasonable in light of the known circumstances.'"  Tubbs v. Stony Brook Univ., 343 F.Supp.3d 292, 309 (S.D.N.Y. 2018).  "The standard is not mere reasonableness, negligence or carelessness; it requires recklessness."  Id.  It has been held that as deliberate indifference claims impose a significant burden on the plaintiff, they rarely proceed beyond a motion to dismiss.  See, Saravanan v. Drexel Univ., 2017 U.S. Dist. LEXIS 193925, at *18 (E.D.P.A. 2017).

Under a deliberate indifference theory, a plaintiff seeks to hold an institution liable for sexual harassment, which requires the plaintiff to demonstrate that an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct.  See, Mallory v. Ohio University, 76 F. App'x 634, 638 (6th Cir. 2003) (other citations omitted).  In Doe v. Brown University (166

F.Supp.3d 177, 191 (D.R.I. 2016)) the court held deliberate indifference typically applies when "a school has ignored a victim's complaint of sexual harassment or assault."

Plaintiff's First Amended Complaint fails to state a cause of action for a violation of Title IX based upon a deliberate indifference theory. Plaintiff alleges that she told Title IX Coordinator Melissa Kelley about the subject incident, which later gave rise to plaintiff's disciplinary complaint, on September 4, 2017. Compl. ¶¶ 74–76. Plaintiff then inaccurately claims that Dr. Kelley took no action to investigate plaintiff's sexual assault. Id. at ¶ 82. This claim is rebutted by plaintiff's own allegation that, upon receiving this information, Dr. Kelley directed plaintiff to go to Union's Wellness Center. Id. at ¶¶ 81, 84. Plaintiff notably fails to point to any of the communications between plaintiff and Dr. Kelley following her trip to the Union's Wellness Center. However, even assuming that there was no follow up conducted as alleged in the First Amended Complaint, it is clear that a meeting was held with Dr. Kelley, along with the plaintiff and her mother, on January 16, 2018. Id. at ¶ 109–110. At this meeting, Dr. Kelley assisted plaintiff in understanding how she could file a formal Title IX complaint with Union. Id. at ¶ 111. Two days after the meeting, Union issued a "No Contact Order" between plaintiff and the respondent. Id. at ¶ 114. On January 22, 2018, plaintiff submitted a written statement to Union. Id. at ¶ 115. Under the Policy, once a complainant submitted a written statement detailing the allegations of the sexual misconduct, the disciplinary process was commenced following the submission of the complaint. Murphy Aff., Ex. A, pp. 39–40. Notably, plaintiff does not allege that Union delayed in commencing an investigation upon receipt of plaintiff's statement and complaint. *See generally,* Compl. ¶¶ 114–117.

Plaintiff also alleges that Union could have commenced an administrative complaint to begin an investigation immediately after learning of plaintiff's complaint in September, 2017.  Compl. ¶¶ 91–94.  The Policy does reserve Union's right to independently initiate a disciplinary complaint against a student.  Murphy Aff., Ex. A, p. 42.  However, the Policy notes that "[t]o initiate an Administrative Complaint, the college will obtain enough information about the incident to prepare a complaint statement which will be used in place of the Complainant's Statement within this process.  The gathering of information for the complaint usually involves obtaining an account from the victim/survivor."  Id. at pp. 42–43.  Therefore, even had Union decided to commence an Administrative Complaint against the respondent, Union would need to gather information in support of that claim by meeting with plaintiff to obtain an account.  As such, the meeting in January, 2018 would have been an important, if not essential, part of Union's investigation into the complaint, whether this meeting was for the purpose of commencing a complaint filed by plaintiff, or if it was for the purpose of investigating the complaint by Union for an Administrative Complaint.  Notably, plaintiff does not allege that the date of the written complaint and alleged "delay" had any effect on the outcome.

Plaintiff's First Amended Complaint asserts speculative and conclusory claims about Union's investigation and handling of other claims of sexual misconduct.  Compl. ¶¶ 104–106.  As an initial matter, these allegations contain absolutely no factual substance, even as they relate to plaintiff's allegations of purported wrongdoing by Union. See, id.  In any event, even if these claims were true, plaintiff's claims of improper handling of claims of sexual misconduct brought by other students have absolutely no

relation to whether or not Union followed the Sexual Misconduct Policy in resolving plaintiff's complaint of sexual misconduct.

Plaintiff's First Amended Complaint reveals that Union took steps to support plaintiff, assist her in evaluating her options for pursuing her complaint, and in commencing the disciplinary process based upon her complaint. Even absent the several steps that Union took to support plaintiff which are not reflected in the First Amended Complaint, plaintiff has failed to sufficiently allege that Union failed to comply with the Policy to promptly and efficiently investigate this matter. Based on the foregoing, plaintiff's First Amended Complaint fails to plausibly state that Union was deliberately indifferent in violation of Title IX.

Plaintiff also alleges that Union College has a "checkered past with Title IX Complaints." Compl. p. 13. To support that allegation, plaintiff points to an alleged OCR investigation commenced in July, 2015, more than two years prior to plaintiff attending the College. Id. at ¶¶ 100–103. Plaintiff also supports this allegation with harmful and speculative claims, qualified by "[b]y was of example only" and "upon information and belief," that Union improperly handled complaints of sexual misconduct. Compl. ¶ 105. This implies that plaintiff is alleging that Union had a pre-incident policy of failing to adequately respond to sexual assault. However, plaintiff has failed to allege any actual knowledge on behalf of Union College of a heightened risk. See, Tubbs v. Stony Brook Univ., 2016 U.S. Dist. LEXIS 28465, at *26 (S.D.N.Y. 2016). In addition, the mere fact that an OCR investigation was commenced, without more, is insufficient to constitute deliberate indifference by Union. See, id. at *28 ("[t]he Court agrees that a plaintiff must allege additional facts beyond past incidents of assault on campus to sustain a pre-

assault Title IX claim.)  *See also*, <u>Ross v. Corp. of Mercer Univ.</u>, 506 F.Supp.2d 1325, 1356 (M.D.Ga. 2007) ("[t]he mere fact that students at Mercer have been victims of sexual assault in the past is, unfortunately, not uncommon for a University setting.  Past incidents of assault alone-without any evidence of deliberate indifference on Mercer's part-are not enough to trigger Title IX liability for Mercer.").  As plaintiff has failed to allege that an OCR investigation commenced two years prior has any relation to this lawsuit, the mere existence of this investigation is insufficient to allege that Union was deliberately indifferent.  In addition, plaintiff's speculative claims do not serve to legitimize plaintiff's claims relative to Union's handling of plaintiff's complaint of sexual misconduct.

Based on the foregoing, plaintiff's first and second causes of action for violations of Title IX fail to state causes of action.  Therefore, both causes of action must be dismissed.

### POINT II

**PLAINTIFF'S FIRST AND SECOND CAUSES OF ACTION BROUGHT UNDER TITLE IX MAY BE BROUGHT ONLY AGAINST INSTITUTIONAL DEFENDANTS**

In the alternative, if plaintiff's first and second causes of action are not dismissed, the defendants seek an Order of the Court limiting plaintiff's Title IX claims to only institutional defendants.  The Supreme Court has held that "Title IX reaches institutions and programs that receive federal funds . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals[.]" <u>Fitzgerald v. Barnstable Sch. Comm.</u>, 555 U.S. 246 (2009).  *See also*, <u>Wolff v. State Univ. of N.Y. College at Cortland</u>, 2016 U.S. Dist. LEXIS , at *73 (N.D.N.Y. 2016) (holding that individual defendants cannot be held liable under Title IX because they are not recipients

of federal funds); <u>Chandrapaul v. City Univ. of N.Y.</u>, 2016 U.S. Dist. LEXIS 52961 (E.D.N.Y. 2016).

Plaintiff's first and second causes of action are brought under Title IX may only be asserted against the institutional defendants, as it is axiomatic that there is no liability for individuals under Title IX.  *See*, <u>Fitzgerald</u>, 555 U.S. at 246.  The First Amended Complaint appears to assert these causes of action against "the University defendants" (defined therein as the Board of Trustees of Union College and Union College).  However, plaintiff's initial complaint did assert these causes of action against the individual named defendants as well.  As such, the defendants respectfully request an Order limiting plaintiff's first and second causes to only institutional entities should the first and second causes of action not be dismissed pursuant to this motion.

<u>**POINT III**</u>

**PLAINTIFF'S THIRD CAUSE OF ACTION FOR NEGLIGENCE MUST BE DISMISSED AS IT FAILS TO STATE A CAUSE OF ACTION**

Plaintiff's First Amended Complaint alleges that Union breached its "duty of care" to plaintiff, namely its "duty of reasonable care to protect Plaintiff from a sexually hostile environment which Defendants fostered[.]"  Compl. ¶ 261. But any duty that Union owed to plaintiff arises solely out of the parties' contractual relationship.  Because the only duties that Union owed to plaintiff are contractual in nature, any negligence cause of action fails as a matter of law.

Under New York law, a plaintiff is not entitled to recover for negligence unless (1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached or failed to exercise that duty; and (3) the plaintiff suffered injury as a proximate result of that failure.  *See*, <u>Keating v. Town of Burke</u>, 86 A.D.3d 660 (3d Dep't 2011).  When the duty

of care at issue is created entirely by contract, no tort liability can lie. <u>New York Univ. v. Cont'l Ins. Co.</u>, 87 N.Y.2d 308, 316 (N.Y. 1995); <u>Clark-Fitzpatrick, Inc. v. Long Island R. Co.</u>, 70 N.Y.2d 382, 389–90 (N.Y. 1987).  New York courts have affirmatively rejected the doctrine of "in loco parentis" at the college level. <u>Faiaz v. Colgate Univ.</u>, 64 F. Supp. 3d 336, 362 (N.D.N.Y. 2014) (citing <u>Pasquaretto v. Long Island Univ.</u>, 106 A.D.3d 794, 795 [2d Dep't 2013] for the proposition that the college had no legal duty to shield its students from the dangerous activity of other students.)

Furthermore, it is settled that absent some separate voluntary undertaking, a university owes its students no other, non-contractual duty of care.[5]  *See, e.g.,* <u>Talbot v. N.Y. Inst. of Tech</u>, 225 A.D.2d 611 (2d Dep't 1996); <u>Vought v. Teachers College, Columbia University</u>, 127 A.D.2d 654, 655 (2d Dep't 1987).  *See also,* <u>Prasad v. Cornell Univ.</u>, 2016 U.S. Dist. LEXIS 161297, at *73–74 (N.D.N.Y. 2016) ("Simply alleging a duty of care does not transform a breach of contract claim into a tort claim.")  As the First Amended Complaint alleges no such separate undertaking,[6] plaintiff's third cause of action for negligence fails as a matter of law and must be dismissed.

## POINT IV

### PLAINTIFF'S FOURTH CAUSE OF ACTION FOR INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS MUST BE DISMISSED AS IT FAILS TO STATE A CAUSE OF ACTION

#### a.     Plaintiff's cause of action for intentional infliction of emotional distress fails to state a cause of action

---

[5] For purposes of this motion, the defendants will assume that plaintiff is alleging that Union's Sexual Misconduct Policy forms the contract between Union and plaintiff.  The defendants are not admitting or confirming the accuracy of these allegations.

[6] It is clear that there are not separate, non-contractual undertakings apart from the alleged contractual duty arising from the Policy.  Furthermore, there is no New York cause of action for negligent prosecution or investigation. *See,* <u>Prasad v. Cornell Univ.</u>, 2016 U.S. Dist LEXIS 161297, at *74 (N.D.N.Y. 2016).

The tort of intentional infliction of emotional distress has three elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; and (3) a causal connection between the conduct and injury.  *See*, Leff v. Our Lady of Mercy Academy, 150 A.D.3d 1239 (2d Dep't 2017).  New York courts are "very strict" in applying these elements.  *See*, Gay v. Carlson, 60 F.3d 83, 89 (2d Cir. 1995); Martin v. Citibank, N.A., 762 F.2d 212, 220 (2d Cir. 1985).

Further, "[a] cause of action for either intentional or negligent infliction of emotional distress must be supported by allegations of conduct by a defendant 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.'"  Howell v. New York Post Co., 81 N.Y.2d 115, 122 (N.Y. 1993), *quoting*, Murphy American Home Prods. Corp., 58 N.Y.2d 293, 303 (N.Y. 1983).  *See also*, Martin v. Citibank, N.A., 762 F.2d 212, 229 (2d Cir. 1985).  Determining whether the alleged conduct is sufficiently outrageous to be actionable is a question of law for the Court.  Howell, 81 N.Y. 2d at 122.

The gravamen of the First Amended Complaint is that Union failed to abide by its own procedural guidelines and regulations in conducting its investigation and resolving the complaint.  Compl. ¶¶ 269–271.  Even if true, this conduct does not constitute the extreme and outrageous behavior—typically involving physical or psychological abuse or a long-running campaign of harassment—that New York courts find an adequately pled claim for intentional infliction of emotional distress.  *See, e.g.*, Cavallaro v. Pozzi, 28 A.D.3d 1075, 1078 (4th Dep't 2006).

Indeed, several courts have held that a university's handling of investigation and hearing of sexual harassment charged was not sufficiently "extreme and outrageous" to constitute a claim for intentional infliction of emotional distress.   See, Fraad-Wolff v. Vassar College, 932 F. Supp. 88, 93-94 (S.D.N.Y. 1996) (finding the college's handling of investigation and hearing of sexual harassment charges against a student did not support an IIED claim); Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 247 (D. Vt. 1994); Doe v. Rider Univ., 2018 U.S. Dist. LEXIS 7592, *50-51 (D.N.J. 2018) ("A college's decision, when confronted with a student's accusation of rape, to confront another student with the charges, hold a hearing, and support the findings of the tribunal on appeal cannot form the basis of an IIED claim, even if various procedural errors are alleged by the plaintiff."); Doe v. Coll. of Wooster, 243 F.Supp.3d 875, 895 (N.D. Ohio 2017) ("Because it is undisputed that Wooster took the action it did against plaintiff in response to a claim of sexual assault lodged by another student, the alleged conduct in this case fails to meet this demanding standard.")   As such, plaintiff's allegations fail to plausibly allege sufficiently culpable conduct to state a cause of action for intentional infliction of emotional distress.

**b.      Plaintiff's cause of action for negligent infliction of emotional distress fails to state a cause of action**

Under New York law, a plaintiff may recover for negligent infliction of emotional distress under one of two theories: (1) the "bystander theory" or (2) the "direct duty theory."   United States ex rel. Ben-Shlush v. St. Luke's-Roosevelt Hosp., 2000 U.S. Dist. LEXIS 3039, *11 (S.D.N.Y. 2000).   See also, Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996).  Here, plaintiff clearly has no cause of action under the "bystander theory," which requires that she have witnessed the death or serious bodily injury of a member of

24

her immediate family.  *See*, Mortise, 102 F.3d at 693.  Thus, it is presumed that plaintiff's claim will rest on the "direct duty theory," under which she must show that she "suffered an emotional injury from [the defendants'] breach of a duty which unreasonably endangered her own physical safety," (id. at 693), or causes her to fear for her physical safety.  *See*, Johnson v. New York City Bd. of Educ., 704 N.Y.S.2d 281 (2d Dep't 2000).  The duty alleged "must be specific to the plaintiff, and not some amorphous, free-floating duty to society."  Mortise, 102 F.3d at 693.  "[I]t is well settled that the 'circumstances under which recovery may be had for purely emotional harm are extremely limited and, thus, a cause of action seeking such recovery must generally be premised upon a breach of duty owed directly to the plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for [her] own physical safety.'"  Simpson v. Uniondale Union Free Sch. Dist., 702 F.Supp.2d 122, 134 (E.D.N.Y. 2010).

Plaintiff's negligent infliction of emotional distress claim must be dismissed because plaintiff has not alleged one of the "extremely limited" circumstances where Union's conduct endangered plaintiff's physical safety or caused her to fear for her own safety.  *See*, Id.  In addition, a cause of action for negligent infliction of emotional distress also requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress.  Id.  Plaintiff's claim must also be dismissed, as plaintiff's claims that Union failed to abide by its own procedural guidelines and regulations in conducting its investigation and resolving the complaint does not constitute "extreme and outrageous conduct."  Based on the foregoing, plaintiff's claim for negligent infliction of emotional distress must be dismissed.

Based on the foregoing, plaintiff's fourth cause of action for negligent and/or intentional infliction of emotional distress must be dismissed, as plaintiff's First Amended Complaint fails to state a cause of action under either theory.

## POINT V

### PLAINTIFF'S FIFTH CAUSE OF ACTION FOR BREACH OF CONTRACT MUST BE DISMISSED AS IT FAILS TO STATE A CAUSE OF ACTION

Under New York law, "an implied contract is formed when a university accepts a student for enrollment." Papelino v. Albany College of Pharm. of Union Univ., 633 F.3d 81, 93 (2d Cir. 2011). "The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student." Id. (internal quotation marks omitted). As alleged in the First Amended Complaint, plaintiff's contract claim arises from the Union College Sexual Misconduct Policy. This Policy, according to the First Amended Complaint, implies an agreement between Union and its students to conduct prompt and equitable investigations into, and adjudication of, complaints of sexual misconduct.

Plaintiff's allegations about Union's failure to provide things that either are not provided for in the policies and procedures or are expressly forbidden by them cannot constitute a breach of contract claim. As an example, plaintiff alleges that she was not provided the investigation report and supporting documentation in advance of the pre-decision conference. Compl. ¶¶ 156–188. However, the Policy is clear that, while the report is made available for both parties to review and submit written feedback on, it is not to be taken or copied by either party. Murphy Aff., Ex. A, p. 50. This and similar allegations related to Union's failure to do things which are specifically not allowed or not addressed under the Policy cannot constitute breaches of the Policy.

In addition, plaintiff alleges that Union breached its contractual undertakings by failing to "abide by the Policy and/or the Administrative Policy".  Compl. ¶ 281.  Such general statements of university policy cannot give rise to a claim for breach of contract.  *See*, Ward v. New York Univ., 2000 U.S. Dist. LEXIS 14067, *10–12 (S.D.N.Y. 2000) (holding that "general statements of policy . . . cannot [be] the basis of a breach of contract claim.); Gally v. Columbia Univ., 22 F.Supp.2d 199, 208 (S.D.N.Y. 1998) (holding that "a general statement of adherence by [a school] to existing antidiscrimination laws … does not create a separate and independent contractual obligation").  Plaintiff's First Amended Complaint makes only conclusory allegations concerning Union's breach of any of these general statements.  These broad allegations fail to properly allege that Union breached the Policy.

By premising a cause of action on Union's Policy, plaintiff asks this Court to second guess discretionary and reasoned judgments of educational professionals following the Policy guidelines.  New York courts have held that "when a disciplinary dispute arises between the student and the institution, judicial review of the institution's actions is limited to whether the institution acted arbitrarily or whether it substantially complied with its own rules and regulations."  Routh v. University of Rochester, 981 F. Supp. 2d 184, 208 (W.D.N.Y. 2013).  "Plaintiff must identify the specific terms of the implied contract that the claims were violated by the university."  Id.  "The mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim upon which relief can be granted."  Gally v. Columbia Univ., 22 F. Supp. 2d 199, 207 (S.D.N.Y. 19978).

Plaintiff's allegations confirm that Union, at the very least, "substantially complied with its own rules and regulations," and therefore the First Amended Complaint fails to state a claim for breach of contract.

Plaintiff claims that her advisor, who chose to appear remotely, was not able to properly hear or see the finalized report.  Compl.  ¶¶ 141–144.  Union's Policy gives both the complainant and respondent the opportunity to bring an advisor of their choosing to the review of the final report.  Murphy Aff., Ex. A, p. 50.  It does not provide for remote connection for advisors not present at the review.  *See*, Id.  Indeed, the accommodation of remote connectivity for an advisor who chose not to appear for this review is above and beyond what Union was required to do under the Policy.  Id.  Choices made by plaintiff's own advisor (an employee of plaintiff's attorney) does not form the basis for a breach of contract claim.

Plaintiff also claims that respondent was improperly permitted to review the complaint and submit a response.  Compl. ¶ 116.  This is expressly permitted under the Policy.  Murphy Aff. Ex. A, pp. 43–45.  The Policy states that if the respondent contests the conduct alleged in the complaint, then "they will be asked to provide a written response to the information contained in the Complaint Form." Id. at p. 45.

Plaintiff argues with the order in which the investigators conducted their investigation.  Compl.  ¶¶ 119, 123–125.  While Union's written policies provide that neutral investigators are appointed to conduct an investigation, neither the complainant nor the respondent may dictate the manner in which the investigation is conducted, nor is the order set forth in the Policy.  Ex. A, pp. 46–47[7].  This is a matter of professional

---

[7] Each of plaintiff's specific allegations of non-compliance with the Policy are addressed below.

judgment for the investigators, which is subject to review upon the submission of the investigative report to the Senior Associate Dean of Students and Director of Student Conduct and the Title IX Coordinator.   In any event, the complaint concedes that the investigators *did* interview witnesses, including at least three witnesses identified by plaintiff. Compl. ¶¶ 121–131, 134.  Plaintiff's argument that the witness interviews should have been conducted in a different order does not constitute Union's breach of the Policy because it is not provided for in the Policy.  *See*, Routh, 981 F.Supp.2d at 208.

In addition, the First Amended Complaint makes various complaints about the composition of the Adjudication Panel and plaintiff's pre-decision conference.  Compl. ¶¶ 151–154.  The Adjudication Panel was properly composed of (1) the Associate Dean of Students; (2) two faculty members; (3) the Director of Residential Life; and (4) a Union Student.  Id. at ¶ 152.  This is proper under the Policy.  The Policy sets forth that the Panel will consist of four members which *typically* consists of two faculty or staff members, two students, and the chair, who is a Senior Student Affairs Administrator.  Murphy Aff., Ex. A, pp. 51–52 (emphasis added).  The Panel in this case consisted of five members who are from the categories mentioned in the Policy.  *See*, id.  The First Amended Complaint also incorrectly implies that essential Union employees were not on the Adjudication Panel.  Compl. ¶¶ 151–152.  Indeed, the Title IX officer is not *on* the Adjudication Panel, but rather *selects* the adjudication panel.  Murphy Aff., Ex. A, pp. 50–51.

The First Amended Complaint also alleges that Dr. Kelley and college counsel were not present at the pre-decision conference.  Compl. ¶¶ 151–152.  This is proper under Union's Policy.   The Policy states as follows: "Present at the Pre-Decision Conference will be the Complainant and their advisor or the Respondent and their advisor

as well as the Administrative Panel members, the Title IX Coordinator, *and/or* College counsel."

Plaintiff also alleges that she was not provided with the investigative report or its supporting documents prior to, or at, the pre-decision conference.  Compl. ¶¶ 155–158. Complainant is specifically not provided with the investigative report under the Policy. The Policy states that while the investigative report is made available for review, "the documents and any evidence, either originals or copies, will not be permitted to leave the office."  Murphy Aff., Ex. A, p. 50.

The First Amended Complaint implies that the respondent was given more opportunities to submit and rebut the evidence than plaintiff.   Compl. ¶¶ 162–166.

Not only is this factually inaccurate, a review of the Policy reveals that Union followed the Policy in conducting the respondent's pre-decision conference.  The Policy states that at the pre-decision conference, both the complainant and the respondent were permitted to "comment on and respond to the information presented, ask and answer questions, and provide additional information that should be considered prior to a final decision being rendered regarding the disciplinary complaint." Murphy Aff., Ex. A, p. 52. Furthermore, "[t]he Complainant and Respondent may each provide a rebuttal statement, impact statement or narrative, or identify any new documents or information that may be relevant to the finding at the Pre-Decision Conference."  Id.  Indeed, plaintiff exercised this right by submitting questions to be asked of the respondent at the pre-decision conference.  Compl. ¶ 168.  Plaintiff's criticisms of the substance of the information provided by the respondent are improper, as these issues were considered in the

deliberation process.  This lawsuit is not the forum for a rehearing, even though that appears to be the primary focus of plaintiff's First Amended Complaint.

Following the conferences, both parties were given an opportunity to review the entire transcript of the pre-decision conferences of both parties, and may provide "additional information, statements, or questions a party determines should be raised with the other party."  Murphy Aff., Ex. A, p. 52. Plaintiff's First Amended Complaint reflects that she took that opportunity and provided the Panel with twelve pages of both corrections to her transcript and responses to the respondent's transcript.  Compl. ¶ 184. Those corrections were then provided to the Panel in connection with their consideration of the investigative report, supporting documentary evidence, and transcripts from the pre-decision conference.  Id.

The Panel deliberated and determined that, by a preponderance of the evidence, it was more likely than not that respondent was not responsible for the conduct alleged in plaintiff's First Amended Complaint.  Compl. ¶ 191; Murphy Aff., Ex. A, p. 55.  Plaintiff's attempts to substitute her own judgment of the evidence does not change the fact the Union adhered to its Policy in investigating and resolving plaintiff's complaint of sexual misconduct under the Policy.  A review of the Policy reveals that Union complied with the directives in the policy in efficiently and equitably resolving this complaint.  *See generally*, Murphy Aff., Ex. A.

With regard to plaintiff's appeal, Union complied with the Policy by appointing Union's Chief of Staff, Darcy Czajka, to act as Chair of the Appeals Panel.  Compl. ¶ 213. Under the Policy, Appeals Panels are comprised of "three impartial, trained persons: a senior administrator appointed by the President or his/her designee, who acts as the chair

31

of the Panel, and two trained panel members, who are part of the Adjudication Panel pool of members and were not part of the original decision making process." Murphy Aff., Ex. A, p. 59. As a senior administrator, Ms. Czajka was an appropriate Chair of the Appeals Panel under the Policy. Id. The allegation that the Chief of Staff's role is to protect institutional interests is based on the false premise that those interests were opposed to compliance with its own policies and applicable statutes. Compl. ¶ 215. In addition, this premise is based on the faulty and speculative assumption that Union College was biased toward one side or another in resolving plaintiff's complaint. Id.

In addition, plaintiff was not entitled to the documentation and information she deems herself entitled to in consideration of the appeal. Compl. ¶¶ 204–211. Nonetheless, she received it from Union. Compl. ¶¶ 210-211; Murphy Aff., Ex. A, p. 59. Under the Policy, Union properly issued a written decision detailing the outcome of the appeal following the Appeal Panel's deliberation. Murphy Aff., Ex. A, p. 60.

Based on the foregoing, the First Amended Complaint reveals that Union conducted a disciplinary process that fully conformed to Union's Policy. Plaintiff's dissatisfaction with the outcome is an insufficient basis to state a claim for breach of contract. Therefore, plaintiff's claim for breach of contract must be dismissed.

## POINT VI

### PLAINTIFF DOES NOT HAVE A PRIVATE RIGHT OF ACTION UNDER THE VIOLENCE AGAINST WOMEN ACT

Plaintiff's First Amended Complaint alleges that Union violated the Violence Against Women Act ("VAWA") in investigating and adjudicating plaintiff's complaint of sexual misconduct against another student. Compl. ¶¶ 226–233. These allegations are improper as plaintiff does not have a cause of action against the defendants under VAWA.

Specifically, the Supreme Court in United States v. Morrison, (529 U.S. 598, 627 (2000)) held that there is no private right of action under the remedial provisions of the Violence Against Women Act.  See also, Esposito v. New York, 453 Fed.Appx. 37, 39 (2d Cir. 2011); Clesi v. Zinc Corp. of Am., 2011 U.S. Dist. LEXIS 16441, *6 (N.D.N.Y. 2001).  As such, any claim arising under VAWA is improper and must be dismissed.

## CONCLUSION

Even if the allegations in plaintiff's First Amended Complaint are accepted as true, it fails to state a claim upon which relief can be granted.  The First Amended Complaint reflects that Union followed its policies and procedures set forth in its Sexual Misconduct Policy to equitably, impartially, and efficiently resolve plaintiff's complaint.  As such, the defendants respectfully request an Order dismissing plaintiff's complaint, with prejudice and on the merits, pursuant to Fed. R. Civ. Pro. 12(b)(6), together with such other and further relief the Court may deem just and proper.

DATED:     May 6, 2019

CARTER, CONBOY, CASE, BLACKMORE, MALONEY & LAIRD, P.C.

By:

MICHAEL J. MURPHY
Bar Roll No.: 102244
Attorneys for Defendants
Office and P.O. Address
20 Corporate Woods Boulevard
Albany, NY  12211-2396
Phone: (518) 465-3484
E-Mail: mmurphy@carterconboy.com

TO:   NESENOFF & MILTENBERG, LLP
Attorneys for Plaintiff
363 Seventh Avenue, Fifth Floor
New York, NY  10001