**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JANE DOE,**

**1:19-cv-284**
     **Plaintiff,**     **(GLS/CFH)**

  **v.**

**UNION COLLEGE et al.,**

     **Defendants.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|

**FOR THE PLAINTIFF:**

| Nesenoff & Miltenberg, LLP | ANDREW MILTENBERG, ESQ. |
|---|---|
| 363 Seventh Avenue, 5th Floor | GABRIELLE M. VINCI, ESQ. |
| New York, NY 10001 | STUART BERNSTEIN, ESQ. |

**FOR THE DEFENDANTS:**
_Union College_
_The Board of Trustees of Union College,_
_Melissa A. Kelley, Trish Williams,_
_Darcy A. Czajka_

| Barclay Damon LLP | MICHAEL J. MURPHY, ESQ. |
|---|---|
| 80 State Street | BRIENNA L. CHRISTIANO, ESQ. |
| Albany, NY 12207 | |

_Alpha Chapter of Theta Delta Chi_
_International Fraternity at Union College_

| Chartwell Law | CARMEN A. NICOLAOU, ESQ. |
|---|---|
| 81 Main Street, Suite 100 | |
| White Plains, NY 10601 | |

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff, a Union College student who is identified by the pseudonym Jane Doe, commenced this action on March 1, 2019 against defendants Union College, the Board of Trustees of Union College, Melissa A. Kelley, Trish Williams, and Darcy A. Czajka (collectively, hereinafter "University defendants"), and Alpha Chapter of Theta Delta Chi International Fraternity at Union College (hereinafter "TD Chi").  (Am. Compl., Dkt. No. 19.)

Plaintiff asserts five causes of action against University defendants: (1) discrimination in violation of Title IX[1]: sexually hostile culture; (2) gender discrimination in violation of Title IX: deliberate indifference; (3) negligence; (4) intentional and/or negligent infliction of emotional distress; and (5) breach of contract.  (*Id.* ¶¶ 241-82.)  Plaintiff asserts two causes of action against TD Chi: (1) negligence, and (2) intentional and/or negligent infliction of emotional distress.  (*Id.*)

Before the court is University defendants' and TD Chi's motions to dismiss.  (Dkt. Nos. 23, 31.)  For the following reasons, University

---

[1] *See* 20 U.S.C. §§ 1681-88.

defendants' motion to dismiss is granted in part and denied in part, and TD Chi's motion to dismiss is granted.

## II. <u>Background</u>

### A. <u>Facts</u>[2]

On or about September 3, 2017, plaintiff, having arrived early to campus for a pre-orientation leadership program, attended a party at the all-male fraternity TD Chi. (Am. Compl. ¶¶ 22-25, 28.) According to plaintiff, "TD Chi's parties are known by the entire College community to pose a significant risk to female students of sexual assault, harassment, and sexual violence," (*id.* ¶ 28), and Union "permitted and condoned its all-male fraternities, including and especially TD Chi, to foster a social environment rampant with sexual violence and harassment towards women," (*id.* ¶ 32).

Prior to arriving at the party, "[p]laintiff drank one or two shots of straight vodka," and "approximately two full cups of beer" while at the party.

---

[2] The following facts are taken from plaintiff's complaint and Union's Sexual Misconduct Policy for years 2017-2018 (hereinafter "the policy"). *See Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014) (on a motion to dismiss, "the Court is entitled to consider facts alleged in the complaint and documents . . . incorporated in it by reference, [and] documents 'integral' to the complaint and relied upon in it"). The court, as it must on a motion to dismiss, accepts as true the allegations of the complaint and draws all inferences in the plaintiff's favor. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

(*Id.* ¶¶ 40, 43.)  At some point, plaintiff asked a male, "Assaulter Roe," (hereinafter "Roe"), a senior student at Union, where the bathroom was located.  (*Id.* ¶¶ 44-45.)  After "escort[ing]" plaintiff to the bathroom and waiting for her, the two began a conversation.  (*Id.* ¶¶ 46-48.)  They then decided to go to Roe's apartment, where they smoked marijuana on Roe's terrace.  (*Id.* ¶¶ 49, 51, 54-55.)  "Plaintiff immediately felt the effects of the marijuana," which "hit her hard and very quickly, unlike anything she had ever known before."  (*Id.* ¶ 56.)

After smoking on the terrace, Roe "led [p]laintiff back to his bedroom," where she felt "confused, dizzy and uncoordinated" so she laid down on the bed.  (*Id.* ¶¶ 57-58.)  Roe joined her on the bed, and "began to touch her breasts and put his hands down her pants."  (*Id.* ¶ 59.)  "[L]ack[ing] the ability and coordination" to push him away, and despite repeatedly telling him "No," Roe proceeded to take his clothes off and rape plaintiff.  (*Id.* ¶¶ 60-63, 68.)

The following day, plaintiff spoke with Kelley, Union's Title IX Coordinator.  (*Id.* ¶ 74.)  Plaintiff reported to Kelley that she had been sexually assaulted the night prior, and identified Roe as her rapist.  (*Id.* ¶ 76.)  In response, Kelley instructed plaintiff to contact the College's

Wicker Wellness Center.  (*Id.* ¶ 81.)  Kelley did not take any further steps to investigate plaintiff's complaint or to report it to the proper authorities. (*Id.* ¶¶ 82, 90.)

On or about January 16, 2018, after suffering "debilitating anxiety and depression," and "living in fear of her rapist being on the same campus," plaintiff decided to meet, for the second time, with the Title IX Office.  (*Id.* ¶¶ 108-10.)  Accompanied by her mother, plaintiff met with Kelley and Williams, the director of campus safety.  (*Id.* ¶ 110.)  This second time around, plaintiff was provided with the policy, and Kelley explained the process of filing a Title IX complaint and the potential avenues for relief available to plaintiff.  (*Id.* ¶¶ 111-12.)

Following the meeting, University defendants issued a "No Contact Order" between plaintiff and Roe.  (*Id.* ¶ 114.)  Thereafter, plaintiff submitted her written statement regarding her Title IX complaint to University defendants.  (*Id.* ¶ 115.)  A few days later, after allegedly having been given an opportunity to review plaintiff's statement first, Roe submitted his own written statement in rebuttal.  (*Id.* ¶ 116.)

Kelley then assigned two investigators to investigate plaintiff's Title IX complaint.  (*Id.* ¶ 117.)  The investigators "intentionally" chose not to

interview plaintiff first, and, instead, interviewed pertinent witnesses and Roe prior to speaking with plaintiff.  (*Id.* ¶¶ 118-22.)  On or about February 23, 2018, the investigators gave Williams their final investigative report. (*Id.* ¶ 132.)  Plaintiff alleges that the report contained misrepresentations of the nature and chronology of the investigation.  (*Id.* ¶¶ 133-38.)

"On or about April 24, 2018, [p]laintiff attended a pre-decision conference, . . . during which time she met with the [h]earing [p]anel."  (*Id.* ¶ 149.)  The panel members consisted of the associate dean of students, two faculty members, the director of residential life, and a sophomore student.  (*Id.* ¶ 152.)  Neither counsel to the college nor Kelly were present at the conference.  (*Id.*)

Plaintiff alleges that University defendants failed to provide her with a copy of the "vital and necessary" materials for her participation in the conference.  (*Id.* ¶¶ 155-57.)  Despite informing the panel that she had not been provided with these materials, she was questioned for one and one-half hours, during which time the panelists repeatedly referenced the materials.  (*Id.* ¶¶ 155-60.)

Thereafter, Roe attended his pre-decision conference, where he "was provided with the complete hearing packet of documents at the start

of the conference." (*Id.* ¶¶ 161-62.)  He was also given the opportunity to submit additional documentation and to make an impact statement.  (*Id.* ¶¶ 166, 180-82.)

On or about May 22, 2018, plaintiff was informed that University defendants found Roe "not responsible" by a vote of 3-2.  (*Id.* ¶¶ 189, 191.) In so holding, "the panel relied upon inaccurate sources which had previously been amended and corrected, and misquoted statements in the [r]eport and conference transcripts." (*Id.* ¶ 192.)  Plaintiff alleges that these were errors that she had corrected in her responses to the report and to her hearing transcript, but "had obviously not been incorporated into those documents nor substantively considered by University [d]efendants." (*Id.*) The panel also allegedly improperly failed to take into consideration her level of incapacitation.  (*Id.* ¶¶ 193-99.)

On or about May 31, 2018, plaintiff appealed the unfavorable decision, which was ultimately denied.  (*Id.* ¶¶ 206, 213.)

Plaintiff contends that approximately three years prior to the assault, in September 2015, the U.S. Department of Education Office for Civil Rights (OCR) opened an investigation, which is currently ongoing, into a complaint that was filed against Union College for its alleged mishandling

of a complaint of sexual assault.  (*Id.* ¶¶ 100, 103.)  Additionally, University defendants have received multiple reports from women regarding experiences of sexual assault, which the University defendants have "refused to look into."  (*Id.* ¶¶ 105-06.)  University defendants "ha[ve], and continue[] to have, a policy of covering up complaints and instances of sexual misconduct on campus."  (*Id.* ¶ 107.)

## B.    Procedural History

Plaintiff filed suit against defendants on March 1, 2019, asserting five causes of action against University defendants as outlined above, *see supra* Part I, and two causes of action against TD Chi, *see supra* Part I. Prior to answering, defendants moved to dismiss for failure to state a claim.  (Dkt. Nos. 23, 31.)

## III.  Standard of Review

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its prior decision in *Mills-Sanchez v. Research Found. for State Univ. of N.Y.*, 1:18-cv-723, 2019 WL 2549726, at *4-5 (N.D.N.Y. June 20, 2019), *appeal filed*, No. 19-2405 (2d Cir. Aug. 6, 2019).

## IV.  Discussion

## A.    Title IX Claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

Plaintiff appears to allege Title IX liability premised on University defendants' deliberate indifference based on both Union's official policy in her first cause of action, and on University defendants' response to plaintiff's allegations regarding the assault in her second cause of action. (Am. Compl.)  The court addresses plaintiff's second cause of action first.

1.    *Deliberate Indifference to Plaintiff's Complaints of Sexual Misconduct as Against University Defendants*

Title IX provides a private right of action against a federally-funded education institution based on peer sexual harassment "where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities."  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).  To allege a Title IX claim arising from harassment, a plaintiff must allege three elements: (1) "sexual harassment . . . that is so severe, pervasive, and objectively offensive that it" deprived the plaintiff of

"access to the educational opportunities or benefits provided by the school"; (2) the school had "actual knowledge" of the harassment; and (3) the school was "deliberately indifferent to the harassment." *Id.* at 650.

A defendant acts with deliberate indifference both when its response to known harassment "is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a lengthy and unjustified delay." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003) (internal quotation marks and citations omitted). "Deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 645 (internal quotation marks, alterations, and citations omitted). "Only actual notice by an 'appropriate person' who can rectify a violation of Title IX can support a claim under Title IX." *Bliss v. Putnam Valley Cent. Sch. Dist.*, No. 7:06-cv-15509, 2011 WL 1079944, at *5 (S.D.N.Y. Mar. 24, 2011) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

Plaintiff alleges that University defendants violated Title IX by responding with deliberate indifference to her reports of sexual misconduct. (Am. Compl. ¶¶ 253-55.) University defendants seek dismissal, arguing that plaintiff fails to allege that she was intentionally discriminated against

on the basis of her sex, and that, in any event, she has not sufficiently alleged that Union failed to comply with the policy to promptly and efficiently investigate her complaint. (Dkt. No. 23, Attach. 3 at 16-20.)

To the extent that University defendants argue that plaintiff fails to allege that any actions taken by them were motivated by plaintiff's gender, (*id.* at 11-16), the court agrees. "Because Title IX prohibits subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Doe v. New York Univ.*, No. 1:19-cv-00744, 2020 WL 564264, at *6 (S.D.N.Y. Feb. 5, 2020) (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016)) (internal quotation marks and alterations omitted). Thus, "Title IX claims require evidence of intentional discrimination" which requires a showing that "the defendant discriminated against [a plaintiff] because of [his or her] sex; that the discrimination was intentional; and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." *Id.* (citations omitted).

Here, although plaintiff labels her second cause of action "*Gender Discrimination* in violation of Title IX: Deliberate Indifference to Plaintiff's Rape as against the University Defendants," (Am. Compl. at 42) (emphasis

added), plaintiff has failed to adequately allege intentional gender discrimination on behalf of University defendants based upon her gender. As such, any gender discrimination claim in violation of Title IX is dismissed.

However, to the extent that University defendants allege that plaintiff fails to sufficiently allege that Union is liable for deliberate indifference by failing to properly respond to her sexual harassment, the court disagrees. Here, the complaint contains allegations that, taken together, support a plausible claim that University defendants were deliberately indifferent to her Title IX complaint.

For instance, plaintiff alleges that, in September 2017, Kelley, a "mandatory reporter," merely instructed plaintiff to contact the College's Wicker Wellness Center, (*id.* ¶¶ 80-81), but, in January 2018, when accompanied by her mother, Kelley met with plaintiff and assisted her in understanding how she could file a formal Title IX complaint with Union, (*id.* ¶¶ 74-83, 90-93, 108-11). In response, University defendants argue that they were not deliberately indifferent to plaintiff's complaint because an investigation was commenced in January after plaintiff filed a complaint of sexual misconduct with the Title IX office. (Dkt. No. 29 at 5.) However,

this does not explain why the same action taken in January—assisting plaintiff in understanding how to file a formal Title IX complaint and providing her with a copy of the policy—was not taken in September, when plaintiff first went to Kelley.[3]

Further, after plaintiff submitted a written statement regarding her Title IX complaint, Roe was notified, and allegedly was given an opportunity to review plaintiff's statement prior to submitting his own.  (Am. Compl. ¶¶ 115-16.)  This is in direct contravention of the policy, which states, in relevant part: "The Respondent will not be allowed to see the Complainant's Statement until after the Respondent has filed [his or her] statement in response to the original Complaint Form."  (*Id.* ¶ 113.)

Additionally, during her conference, the panel allegedly failed to provide plaintiff with necessary hearing materials—which were provided to Roe—even after she made the panel aware of the fact that she did not have these materials.  (*Id.* ¶¶ 148-60; Dkt. No. 26 at 17-19.)  University

---

[3]  To the extent that University defendants seek to support their argument by noting that a "No Contact Order" was issued between plaintiff and Roe "even prior to plaintiff filing her complaint," (Dkt. No. 29 at 6), this only begs the question as to why such an order was not issued in September 2017.

defendants provide no response to this allegation.[4]  Plaintiff also alleges that she was not provided an opportunity to submit an impact statement at this time, even though Roe was.  (Dkt. No. 26 at 19; Am. Compl. ¶¶ 180-82.)

Viewing these facts in the light most favorable to the plaintiff, the complaint contains sufficient allegations that University defendants acted with deliberate indifference in responding to plaintiff's sexual assault.

> 2.    *Hostile Education Environment as Against University Defendants*

In addition to her Title IX claims arising out of University defendants' alleged deliberate indifference in responding to her allegations, plaintiff claims that University defendants were deliberately indifferent to a culture of sexual hostility and violence against women by instituting policies and permitting practices, which subjected her to a sexually hostile education environment.  (*Id.* ¶¶ 241-45.)  According to plaintiff, these policies and

---

[4] University defendants merely argue that "[t]he [p]olicy states that while the investigative report is made available for review, 'the documents and any evidence, either originals or copies, will not be permitted to leave the office.'" (Dkt. No. 23, Attach. 3 at 30.)  But plaintiff alleges that, at the beginning of the conference, "the Chair read to [p]laintiff from a script stating, 'Okay in front of you is the investigative report and any other documents associated with the case,'" to which "[p]laintiff immediately interjected and informed the Chair that neither she nor her advisor had any such documentation in front of them."  (Am. Compl.¶¶ 155-56.)  The panel never provided her with these documents, despite being put on notice, and even though Roe was apparently provided with them.  (*Id.* ¶¶ 157-62.)

practices were the proximate cause of the sexual harassment she endured.  (*Id.*)

To successfully claim that University defendants violated Title IX through a policy of deliberate indifference, plaintiff must establish that the school was "on *actual notice* that their *specific policies* and *responses* to sexual assault were deficient, and their subsequent failure to remedy these policies was the proximate cause of her sexual assault."  *Tubbs v. Stony Brook Univ.*, 343 F. Supp. 3d 292, 319 (S.D.N.Y. 2018).  "[S]omething more than general knowledge of assaults campus-wide (i.e., some greater specificity) is required to satisfy the actual knowledge requirement."  *Tubbs v. Stony Brook Univ.*, No. 15 Civ. 0517, 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016).

Plaintiff argues that University defendants were on notice that Union's policies were deliberately indifferent to sexual violence against women, they failed to remedy these policies, and plaintiff was harmed and subjected to further harassment as a consequence.  (Dkt. No. 26 at 10-13.) University defendants maintain that dismissal is necessary because plaintiff's allegations are broad and speculative, and fail to establish that Union's policies or procedures caused plaintiff's sexual assault.  (Dkt.

No. 29 at 5-8.)

In *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007), the court held that a "funding recipient can be said to have intentionally acted in clear violation of Title IX, when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Id.* at 1178 (internal citation omitted). In *Simpson*, it was alleged that the university's football coach had "general knowledge of the serious risk of sexual harassment and assault during college-football recruiting efforts," he "knew that such assaults had indeed occurred," but he "nevertheless maintained an unsupervised player-host program to show high-school recruits a 'good time.'" *Id.* at 1184. The court found those allegations to be adequate for a jury to infer that the inadequacy of the policy, and the risk of an assault, was "so obvious" as to amount to deliberate indifference. *Id.* at 1184-85.

Here, unlike *Simpson*, plaintiff's allegations fail to allege sufficient facts to support a plausible inference that University defendants "actively created and/or condoned and/or were deliberately indifferent to a culture of sexual hostility and violence against women." (Am. Compl. ¶ 242.) And, to

16

the extent that plaintiff alleges that the OCR is currently investigating Union, (Dkt. No. 26 at 12), she does not allege that the OCR has made any conclusions regarding University defendants' policy, let alone that University defendants agreed to undertake specific remedial measures but then failed to do so. *See, e.g.*, *Tubbs*, 2016 WL 8650463, at *9 (holding that the plaintiff met the pleading standard with allegations that the OCR's investigation concluded with a finding that the university's policies and procedures were deficient, and that although the university agreed to remedy these deficiencies, they failed to do so prior to the plaintiff's assault). As such, plaintiff's claim of Title IX liability premised on an official policy is dismissed.

**B.    State Law Claims**[5]

*1.    Negligence*

To state a negligence claim under New York law, a plaintiff must allege "the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party." *Becker v. Schwartz*, 46 N.Y.2d 401, 410 (1978).

_____

[5] The parties appear to agree that New York law applies to plaintiff's state law claims. (Dkt. No. 23, Attach. 3 at 21-27; Dkt. No. 26 at 21-24; Dkt. No. 31, Attach. 3 at 5-11.)

Plaintiff alleges that "[a]ll defendants owed a duty of reasonable care to protect plaintiff from a sexually hostile environment which University [d]efendants fostered and that was foreseeable," and that "[a]ll defendants knew, or should have known, of the serious risk of sexual harassment and assault that was occurring" on campus, and "knew or should have known of the risk of sexual violence toward their female students." (Am. Compl. ¶¶ 261-62.) Plaintiff further alleges that "[a]ll defendants . . . had a duty of care and loyalty to institute its practices and procedures, in a fair, equitable, reasonable, and unbiased manner." (*Id.* ¶ 264.) According to plaintiff, University defendants breached these duties through its "sexually discriminatory policies, practices, and actions, without any regard for the safety of women," such as plaintiff, on campus, and further breached these duties by "failing to properly investigate and adjudicate" plaintiff's complaint in accordance with the policy and/or Union's Policy for Administrative Complaints. (*Id.* ¶ 265.)

University defendants argue that plaintiff's cause of action fails as a matter of law, because "the duty of care at issue is created entirely by contract" and thus, "no tort liability can lie." (Dkt. No. 23, Attach. 3 at 21-22.) Further, "absent some voluntary understanding, a university owes it

students no other, non-contractual duty of care." (*Id.*) Similarly, TD Chi contends that plaintiff has failed to establish that it owed a duty of care to plaintiff because the assault occurred outside the fraternity's premises, and any allegedly duty "ended the minute [p]laintiff voluntarily left the party with the alleged assailant." (Dkt. No. 31, Attach. 3 at 5-8.)

As a general rule, a college has no legal duty to protect students from being sexually assaulted by other students, and New York has affirmatively rejected the doctrine of in loco parentis at the college level. *See Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 361 (N.D.N.Y. 2014). "However, a duty may be imposed upon a college when it has encouraged its students to participate in an activity and has taken affirmative steps to supervise and control the activity." *Id.* at 361-62 (internal quotation marks and citations omitted).

Here, plaintiff has failed to allege that her relationship with University defendants went beyond that of a university and its student. Thus, she has not plausibly alleged that University defendants had a legal duty to protect her from Roe's past or prospective conduct. Additionally, plaintiff argues that TD Chi owed her a duty because "a landowner has a duty to a visitor to take protective measures" when the landowner, such as TD Chi, "knows

19

or has reason to know from past experience that there is a likelihood of conduct on the part of third persons which is likely to endanger the safety of the visitor." (Dkt. No. 32 at 6) (internal quotation marks and citation omitted).) However, plaintiff has failed to plausibly allege such a duty owed to her by TD Chi. As such, plaintiff's negligence claim against all defendants is dismissed.

>    2.    *Intentional and/or Negligent Infliction of Emotional Distress*

Under New York law, the torts of intentional and negligent infliction of emotional distress require a plaintiff to plead three elements: "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress." *Simpson ex rel. Simpson v. Uniondale Union Free Sch. Dist.*, 702 F. Supp. 2d 122, 134 (E.D.N.Y. 2010). "[A] cause of action [for purely emotional harm] must generally be premised upon a breach of duty owed directly to the plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety." *Id.* at 135 (citing *Jason v. Krey*, 875 N.Y.S.2d 194, 195 (2009)). Additionally, a plaintiff claiming intentional infliction of emotional distress must show "that the defendant intend[ed] to cause severe emotional distress." *Id.* (citations omitted).

20

For the same reasons discussed above, plaintiff's claims fail because she has failed to establish that defendants owed her a duty. Additionally, as all defendants argue, plaintiff has failed to state a cause of action under either theory. (Dkt. No. 23, Attach. 3 at 21-26; Dkt. No. 31, Attach. 3 at 8-11.) "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chanko v. Am. Broadcasting Cos. Inc.*, 27 N.Y.3d 46, 56 (2016) (citation omitted). Even drawing all inferences in favor of plaintiff, the complaint fails to allege facts plausibly suggesting that defendants' conduct met such a standard. As such, plaintiff's negligent and intentional infliction of emotional distress claims are dismissed.

3. *Breach of Implied/Express Contract as Against University Defendants*

Plaintiff alleges that University defendants breached its express and/or implied contract with her by failing to properly investigate and adjudicate her Title IX complaint, the terms of which are found in the policy. (Am. Compl. ¶¶ 277-82.)

In New York, the relationship between a university and its students is contractual in nature. *See Doe v. Syracuse Univ.*, No. 5:18-CV-377, 2019 WL 2021026, at *10 (N.D.N.Y. May 8, 2019). As explained by the Second Circuit, "an implied contract is formed when a university accepts a student for enrollment," the terms of which "are contained in the university's bulletins, circulars and regulations made available to the students." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (internal quotation marks and citations omitted).

To survive a motion to dismiss, a plaintiff must allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Habitzreuther v. Cornell Univ.*, No. 5:14-CV-1229, 2015 WL 5023719, at *5 (N.D.N.Y. Aug. 25, 2015) (citation omitted). And, when asserting a breach of contract claim, a plaintiff must identify the specific terms of the implied contract that were allegedly violated by the college. *Rolph v. Hobart and William Smith Colls.*, 271 F. Supp. 3d 386, 406 (W.D.N.Y. 2017). "General statements of policy or broad pronouncements of a University's compliance with existing anti-discrimination laws, promising equitable treatment of all students cannot provide the basis for a breach of contract claim." *Id.*

(internal quotation marks, alterations, and citations omitted).

University defendants do not appear to dispute that the policy constitutes an implied contract between the parties.  (Dkt. No. 23, Attach. 3 at 26.)  However, University defendants argue that "a review of the policy reveals that Union complied with the directives in the policy in efficiently and equitably resolving" plaintiff's sexual assault complaint, and that her "dissatisfaction with the outcome is an insufficient basis to state a claim for breach of contract."  (*Id.* at 37-38.)

To the extent that plaintiff alleges that University defendants breached its obligations under the policy by failing "to conduct a prompt, fair, and impartial adjudication process," (Dkt. No. 26 at 22), such allegations "are the types of general statements of policy which New York law dictates cannot form the basis of a viable contract claim."  *Doe v. Syracuse Univ*., 341 F. Supp. 3d 125, 141 (N.D.N.Y. 2018) (citation omitted).  As such, these general statements fail to support plaintiff's breach of contract claim.

However, the complaint alleges sufficient facts for the court to plausibly infer that University defendants breached an agreement to resolve plaintiff's allegations of sexual misconduct in a manner consistent

with the terms of the Policy.  For example, plaintiff alleges that University defendants allowed Roe to review plaintiff's statement prior to submitting his own written statement, in contravention of the policy, which states in relevant part: "The Respondent will not be allowed to see the Complainant's Statement until after the Respondent has filed their statement in response to the original Complaint Form."  (Am. Compl. ¶¶ 113, 116.)

Plaintiff additionally alleges that she was not given the opportunity to submit a personal or impact statement, in contravention of the policy, which states in relevant part: "The Complainant and Respondent may each provide a rebuttal statement, impact statement or narrative, or identify any new documents or information that may be relevant to the finding at the Pre-Decision Conference."  (Dkt. No. 26 at 19, 21; Dkt. No. 23, Attach. 2 at 52.)  Drawing all inferences in favor of plaintiff, University defendants' arguments do not provide a basis to dismiss plaintiff's breach of contract claim on these specific allegations.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that TD Chi's motion to dismiss (Dkt. No. 31) is

24

**GRANTED**; and it is further

**ORDERED** that University defendants' motion to dismiss (Dkt. No. 23) is **GRANTED** in part and **DENIED** in part as follows:

**GRANTED** as to plaintiff's claims of a hostile education environment; negligence; and intentional and/or negligent infliction of emotional distress; and

**DENIED** as to plaintiff's claims of deliberate indifference to her complaints of sexual misconduct, as limited by this Memorandum-Decision and Order, and breach of contract; and it is further

**ORDERED** that TD Chi is terminated from the case; and it is further

**ORDERED** that the following claims remain against University defendants: (1) deliberate indifference to plaintiff's complaints of sexual misconduct; and (2) breach of contract; and it is further

**ORDERED** that the parties contact Magistrate Judge Christian F. Hummel for further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

March 5, 2020
Albany, New York

Gary L. Sharpe
U.S. District Judge